# PUC EXHIBIT 1

# ORDER NO. 32664

Office of the Secretary
Service Date
October 12, 2012

## BEFORE THE IDAHO PUBLIC UTILITIES COMMISSION

| | |
|---|---|
| IN THE MATTER OF THE PETITION OF MURPHY FLAT MESA, LLC TO MODIFY ORDER NO. 32255 AND APPROVE A FIRM ENERGY SALES AGREEMENT ENTERED INTO BETWEEN ITSELF AND IDAHO POWER COMPANY | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CASE NO.  IPC-E-10-56 |
| IN THE MATTER OF THE PETITION OF MURPHY FLAT ENERGY, LLC TO MODIFY ORDER NO. 32255 AND APPROVE A FIRM ENERGY SALES AGREEMENT ENTERED INTO BETWEEN ITSELF AND IDAHO POWER COMPANY | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CASE NO.  IPC-E-10-57 |
| IN THE MATTER OF THE PETITION OF MURPHY FLAT WIND, LLC TO MODIFY ORDER NO. 32255 AND APPROVE A FIRM ENERGY SALES AGREEMENT ENTERED INTO BETWEEN ITSELF AND IDAHO POWER COMPANY | )<br>)<br>)<br>)<br>)<br>)<br>)    CASE NO.  IPC-E-10-58<br><br>)    ORDER NO.  32664 |

On June 8, 2011, the Commission issued final Order No. 32255 declining to approve three Power Purchase Agreements ("PPAs" or "Agreements") entered into between Idaho Power Company and Murphy Flat Mesa, LLC; Murphy Flat Energy, LLC; and Murphy Flat Wind, LLC (collectively referred to as the "Murphy projects" or "Petitioners") pursuant to the federal Public Utility Regulatory Policies Act of 1978 (PURPA). After issuance of Order No. 32255 (hereinafter the "*June 2011 Order*") the Murphy projects did not seek reconsideration of the Commission's *June 2011 Order* pursuant to *Idaho Code* § 61-626.

On August 16, 2012, the Murphy projects filed a Petition requesting that the Commission "modify" its *June 2011 Order* by reversing the decision and approving the three PPAs. More specifically, the projects maintain that two declaratory orders issued by the Federal Energy Regulatory Commission (FERC) subsequent to the *June 2011 Order* "constitute new facts or information justifying modification of this Commission's [*June 2011*] *Order*." Petition at 2. "Accordingly, pursuant to *Idaho Code* § 61-624 and the Idaho PUC's rules of procedure, Murphy Flat respectfully petitions the Commission to modify its [*June 2011*] *Order* and approve the [three] Agreements." *Id.* at 1-2 (footnotes omitted). In the alternative, the Petitioners request

that the Commission approve the PPAs (without reference to the FERC Orders) based upon the underlying record. The projects also requested that the Commission issue its Order on an expedited basis no later than August 31, 2012, "without an evidentiary hearing or further proceedings." *Id.* at 12.

On August 24, 2012, Idaho Power submitted a "Limited Answer" objecting to the request for expedited treatment. Limited Answer at 2. Idaho Power advanced several reasons why it should be permitted an opportunity to answer the Petition. *Id.* at 3-7. In particular, Idaho Power requested that it be granted "at least 21 days from the date of the Commission's Order" addressing the request for expedited treatment to file its full answer. *Id.* at 6-7. In the alternative, the Company urged the Commission to deny the Petition because the Murphy projects failed to exhaust their administrative remedies. *Id.* at 7.

On August 30, 2012, the Commission partially granted each party's request and issued a Scheduling Order setting an expedited schedule. Order No. 32629. The Scheduling Order directed Idaho Power to file its answer no later than September 7, 2012, and allowed the Petitioners to file a reply no later than September 14, 2012. Idaho Power filed a timely answer that included a Motion to Dismiss. The Murphy projects filed a timely but abbreviated reply. Based upon our review of the entire record in this consolidated case,[1] we deny the Petition to modify our June 2011 final Order No. 32255 and grant Idaho Power's Motion to Dismiss as set out in greater detail below.

## BACKGROUND

### A. The Eligibility Cap Case

The historical background for this consolidated case is lengthy but the pertinent points are summarized here. On November 5, 2010, Avista Corporation, Idaho Power and PacifiCorp dba Rocky Mountain Power (collectively "the Utilities") petitioned the Commission to initiate a generic investigation to address various PURPA issues. The Utilities requested that during the investigation the Commission "immediately" reduce the "eligibility cap" or ceiling for the "published" avoided cost rates[2] from 10 average megawatts (aMW) per month to 100

---

[1] Because of the similarity of the three Agreements, the Commission consolidated the three cases. Order No. 32255 at 2, n.1; Rule 247, IDAPA 31.01.01.247.

[2] Pursuant to FERC's PURPA regulations, State commissions must "publish" an avoided cost rate for small qualifying facilities (QFs) with a design capacity of 100 kW or less. 18 C.F.R. § 292.304(c)(1). However, PURPA regulations also provide that State commissions "may" set standard or published rates at a higher capacity amount.

kilowatts (kW) per month.[3]   Order Nos. 32212 and 32302.   On December 3, 2010, the Commission issued a Notice to open an investigation (Case No. GNR-E-10-04), solicit initial and reply comments from interested parties, and schedule an oral argument to address the proposed reduction in the eligibility cap.   Order No. 32131 at 6-7.   The Commission's Notice also stated that its decision on whether to lower the eligibility cap would become effective on December 14, 2010.   *Id.* at 6, 9.

The Commission subsequently found that the Utilities made a convincing case to temporarily "reduce the eligibility cap for published avoided cost rates from 10 aMW to 100 kW for <u>wind and solar [QFs]</u> while the Commission further investigates" other PURPA issues. Order No. 32176 at 9 (emphasis original).   The Commission ordered that the eligibility cap be reduced effective December 14, 2010.   Order Nos. 32176, 32212, 32255.   No party appealed from the Commission's Orders reducing the eligibility cap.   Order No. 32302 at 5, 14-15.

### B.  The Three Murphy Agreements

The Utilities' November 2010 petition precipitated a rush of filings by wind qualifying facilities (QFs) (including the Murphy projects) seeking to lock-in published avoided cost rates.   On December 15, 2010, the Murphy projects and Idaho Power executed separate PPAs for the three wind projects to be located near Murphy, Idaho.   Brian Jackson, Manager of American Wind Group, LLC signed each of the Agreements as the authorized manager for each of the Murphy projects.   Application at 2.   Under the terms of each Agreement, the Murphy projects agreed to sell electric power to Idaho Power for a 20-year term using the non-levelized published avoided cost rates for power deliveries of less than 10 aMW per month.   *Id.* at 4.   The nameplate rating for each Murphy project was 25 MW and each Agreement provided that the wind project would not sell more than 10 aMW of power to Idaho Power on a monthly basis. Each Murphy project selected December 31, 2012, as its Scheduled Commercial Operation Date (COD).   *Id.* at 5.

On December 16, 2010, Idaho Power filed three Applications requesting that the Commission "accept or reject" each of the three PPAs.   Application at 1, 9.   On February 24,

---

18 C.F.R. § 292.304(c)(1-2).   In February 2008, the Commission established the eligibility cap for published avoided cost rates for each of the three Utilities at 10 aMW.   Order No. 30488 at 17.

[3] PURPA "avoided costs" are those costs which a public utility would otherwise incur for electric power, whether the power was purchased from another source or generated by the utility itself.   18 C.F.R. § 292.101(b)(6); Order No. 32255 at 2.

2011, the Commission initiated a case by issuing a Notice of Application and Notice of Modified Procedure requesting written comments regarding the three PPAs.  Order No. 32189.  Written comments were submitted by Idaho Power, Commission Staff, the Murphy projects, American Wind Group (the manager of the projects), and members of the public.

On June 8, 2011, the Commission issued its final Order No. 32255 (i.e., the *June 2011 Order*) finding that the three PPAs were not effective prior to December 14, 2010.  More specifically, the Commission noted that the PPAs expressly state that the "effective date" of [each] Agreement – December 15, 2011 – is "the date stated in the opening paragraph of this . . . Agreement representing the date upon which this [Agreement] was fully executed by both Parties."  Agreement at 1, ¶ 1.10.  The Commission noted that the Murphy projects signed the Agreements on December 13, and that Idaho Power signed on December 15, 2010.  *Id.*  Thus, based upon the expressed terms of the Agreements, the Commission found that the PPAs became effective after the eligibility capacity for the published rates was reduced to 100 kW on December 14, 2010.  Order No. 32255 at 8-9.  Neither the Murphy projects nor any other person sought reconsideration of the final Order pursuant to *Idaho Code* § 61-626(1).[4]

### C.  The FERC Declaratory Orders

In June 2011, the Commission also disapproved several PPAs between Idaho Power and Rainbow Ranch, and between Rocky Mountain Power and Cedar Creek Wind.  Order Nos. 32256 and 32260, respectively.  As in the case of the Murphy projects, the Commission found that the Rainbow and Cedar Creek PPAs were not effective until after December 14, 2010.  Rainbow and Cedar Creek sought reconsideration of the Commission's Orders but the Commission reaffirmed its prior Orders.  Order Nos. 32300 and 32302, respectively.

On August 5, 2011, Cedar Creek filed a petition with FERC requesting that the federal agency bring an enforcement action against the Commission or, in the alternative, make certain findings related to the Commission's decision to deny the Cedar Creek PPAs.  FERC Docket No. EL11-59-000.  Cedar Creek also filed a timely Notice of Appeal with the Idaho Supreme Court.  On October 4, 2011, FERC issued an Order declining to bring an enforcement action against the Commission.  However, FERC determined that the Commission's Orders were inconsistent with PURPA and FERC's implementing regulations.  *Notice of Intent not to Act and*

---

[4] This section in pertinent part states that any person "shall have the right, within twenty-one (21) days after the date of said [final] order, to petition for reconsideration in respect to any matter determined therein."  *Idaho Code* § 61-626(1).

*Declaratory Order*, 137 FERC ¶ 61,006 (Oct. 4, 2011) (hereinafter the "*Cedar Creek Order*"). FERC construed the Commission's final Order No. 32260 as "limiting the creation of a legally enforceable obligation only to QFs that have [PPAs] . . . signed by both parties to the agreement." *Id.* at ¶ 26. FERC concluded that the Commission did not recognize that "a legally enforceable obligation may be incurred before the formal memorialization of a [PPA] contract to writing." *Id.* at ¶ 36.[5]

Nearly five months later on March 1, 2012, Rainbow also filed a petition with FERC seeking an enforcement action against this Commission or, in the alternative, that FERC find that the Commission's Orders were inconsistent with PURPA and specifically FERC's *Cedar Creek Order*. On April 30, 2012, FERC declined to initiate an enforcement action against the Commission but issued a declaratory order concluding that the Commission's final Order No. 32256 in Rainbow was inconsistent with the requirements of PURPA. *Notice of Intent not to Act and Declaratory Order*, 139 FERC ¶ 61,077 (April 30, 2012) (hereinafter the "*Rainbow Order*"). Based upon the similarities between the underlying facts in the Cedar Creek and Rainbow cases, FERC applied its determination in the *Cedar Creek Order* to Rainbow's Petition. *Id.* at ¶ 23.

### D.  The Expedited Request and the Scheduling Order

As mentioned above, the Murphy projects asked that the Commission issue its Order approving the Murphy Flat PPAs "no later than August 31, 2012 without further briefing, hearing or other proceedings." *Id.* at 13. The projects advanced three reasons for the Commission to issue its Order within 15 days. First, they maintained that the issue raised in its Petition is "strictly one of law, there being no relevant factual disputes and no need for further factual support." *Id.* at 12. Second, although the projects acknowledged that certain federal financial incentives for QFs are to expire on December 31, 2012, they assumed "that Congress will extend the federal financial incentives another year," until December 31, 2013. *Id.* Consequently, they argued time is of the essence so that the wind projects may be constructed to meet the extended deadline. *Id.* Finally, the projects stated that the process leading up to the issuance of the *June 2011 Order* "was lengthy, and the matters presented in this Petition are straight-forward; they do not require a similar extended process." *Id.*

On August 24, 2012, Idaho Power submitted its "Limited Answer" listing three reasons why the Commission should deny the Murphy projects' request for an Order by August

---

[5] The Commission approved a subsequent settlement in the Cedar Creek case.

31, 2012. First, Idaho Power asserts that it is entitled to at least 21 days in which to file an answer to a petition. Limited Answer at 6 *citing* Rule 57.02. Second, it questioned the need for expedited treatment based upon Murphy's assumption that Congress might continue the financial incentives for QFs that are scheduled to expire at the end of this year. Idaho Power maintained that such speculation is "not a valid reason for the Commission to grant expedited treatment of Murphy Wind's request." *Id.* at 3. Finally, Idaho Power claimed that any alleged need for expedited treatment is undercut by Murphy Flat's failure "to take any action with regard to Order No. 32255 for over one year/more than 14 months. . . ." *Id.* Idaho Power observed that the Murphy projects neither sought reconsideration of the Commission's *June 2011 Order* nor did they "seek any other type of judicial or FERC review for over one year." *Id.* at 5.

The Commission's Scheduling Order No. 32629 denied the projects' request for a final Order no later than August 31, 2012, but granted an expedited proceeding. Without addressing the substantive merits of the Petition, the Commission found that Section 61-624 provides that the Commission may rescind, alter or amend any prior Order or decision <u>after</u> "notice to the public utility affected, and <u>after</u> opportunity to be heard as provided in the case of complaints." *Idaho Code* § 61-624 (emphasis added). "By its very terms, this statute requires that Idaho Power be provided with an opportunity 'to be heard' as provided in the case of complaints." Order No. 32629 at 3. The Commission found that its procedural Rule 57.02 provides that answers to complaints shall generally be made within 21 days. *Id.* citing IDAPA 31.01.01.057.02. Second, the Commission found that the need for an expedited Order is not supported by speculation as to whether Congress may or may not extend the financial incentives. *Id.* Finally, the Commission found that the request for expedited treatment is undercut by the projects' own conduct in this case.

The Commission directed Idaho Power to file its answer by September 7, and directed the projects file a reply (if any) no later than September 14, 2012. The Commission also ordered the parties to disclose whether the PPAs in this case have been assigned to another entity, and if so, when and to whom. *Id.* at 4.

## THE PETITION FOR MODIFICATION

The Murphy projects request this Commission modify its *June 2011 Order* and approve the three Murphy PPAs. Murphy advances two primary arguments why the Commission should reverse its prior Order. First, the projects maintain the two FERC Orders

issued after the *June 2011 Order* "constitute new facts or information justifying modification of the [prior] *Order*." Petition at 2. Although the projects acknowledge they did not seek reconsideration or appeal the Commission's Order, they argue that there "simply is no legal basis upon which to distinguish the *[June 2011] Order* from FERC's *Cedar Creek* and *Rainbow Orders*. *Id.* at 4. Because the factual circumstances in the Murphy case is "in all material respects" similar to the *Cedar Creek* and *Rainbow Orders*, the projects insist that the Commission's *June 2011 Order* "likewise is inconsistent with PURPA and FERC's regulations." *Id.*

In their FERC petitions, both Cedar Creek and Rainbow argued that a "legally enforceable obligation"[6] arose before the effective dates of their PPAs. In its Petition, the Murphy projects maintain that they too had perfected a legally enforceable obligation prior December 14, 2010. *Id.* at 4. The projects maintain that the fact they "did not seek reconsideration of or appeal the *[June 2011] Order* in state court likewise is immaterial as to whether and, if so, when Idaho Power became legally obligated to purchase [power] from Murphy Flat." *Id.* at 4. Consequently, the Petitioners maintain the FERC *Cedar Creek* and *Rainbow Orders* constitute "sufficient grounds for modifying [the *June 2011*] *Order* and approving the Agreements." *Id.*

Second, in the alternative, the Murphy projects request that the Commission exercise its discretion and re-examine the underlying facts in the consolidated case and determine that a "legally enforceable obligation" was incurred prior to December 14, 2010. *Id.* at 7-10. The Murphy projects maintain that the Commission has sometimes used a broad array of factors to determine when QFs have established "a legally enforceable obligation for published rate entitlement." *Id.* at 5 (footnote omitted). Rather than utilizing the date when an executed PPA became effective, the projects stated that the Commission has used looser criteria in the past. For example, past criteria has included when a signed PPA was submitted to the utilities, or where the QF could "demonstrate 'other indicia of substantial progress and project mature.'" *Id.* at 5. The projects maintain that factors showing substantial progress and maturity include: completion

---

[6] The term "legally enforceable obligation" is found in 18 C.F.R. § 292.304(d). This subsection provides in pertinent part that a QF has the option to sell power to a public utility "pursuant to a legally enforceable obligation for the delivery of [power] over a specified term . . . based upon either: (1) the avoided cost calculated at the time of delivery; or (2) the avoided costs calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2).

of wind studies; contracts for wind turbines; arranged financing for the project; and progress on permitting and licensing. *Id.* at 5-6.

The projects maintain that without reference to the FERC Orders, "if the Commission were to choose to exercise its discretion and discontinue using a fully executed contract standard, then it would be entirely appropriate for the Commission . . . to employ the aforementioned criteria to determine whether a 'legally enforceable obligation' had been incurred" by the Murphy projects. *Id.* at 7. More to the point, the Petitioners maintain that a legally enforceable obligation arose on December 13, 2010 – the date Murphy executed the three PPAs. *Id.* at 8. Consequently, the Petitioners state "that as of December 13, 2010 the Projects were more than sufficiently mature so as to require Idaho Power to negotiate and eventually execute a contract pursuant to PURPA." *Id.* at 10.

Having demonstrated that the Murphy projects were significantly mature and that a legally enforceable obligation existed as of December 13, 2010, the projects request that the Commission exercise its discretion and modify its prior Order. *Id.* at 11. More specifically, they request that the Commission find that a legally enforceable obligation existed; that Murphy projects are entitled to receive the published avoided cost rates for projects up to 10 aMW; and that the Agreements should be approved by the Commission without further hearings or proceedings. *Id.*

The Murphy projects acknowledged that they did not seek reconsideration of the final *June 2011 Order*. However, they maintain that the Commission may modify that Order pursuant to *Idaho Code* § 61-624. That section provides in pertinent part that the Commission "may at any time, upon notice to the public utility affected, and after opportunity to be heard as provided in the case of complaints, rescind, alter or amend [an] order or decision made by it." *Id.* at 11 *quoting Idaho Code* § 61-624. "Because the holdings in Cedar Creek and Rainbow Ranch apply equally here, the Commission should exercise its authority under *Idaho Code* § 61-624 and modify the [*June 2011*] *Order* so as to approve the Agreements." *Id.*

## IDAHO POWER ANSWER

In its answer, Idaho Power advances three arguments why the Petition should be denied and why its Motion to Dismiss should be granted. First, Idaho Power asserts that the Murphy projects' request that the Commission approve the three PPAs is "an impermissible collateral attack on the Commission's final June 2011 Order." Answer at 3. Second, the

Petitioners requested relief is barred by the doctrines of collateral estoppel and *res judicata.* "Third, and most importantly, Murphy Wind's requested relief is contrary to the public interest and should be denied." *Id.* at 3, 5. The utility insists that because of Murphy's "own failure to act, pursue its legal claims, or preserve its ability to challenge the Commission's Order for over one year, a procedural bar exists at the state level." *Id.* at 3. Thus, Idaho Power argues that Murphy is procedurally barred by state law from the relief it requests.

         1.   <u>Impermissible Attack</u>.  As mentioned above, Idaho Power maintains that the Petition should be dismissed because it is an impermissible collateral attack upon a final Order of this Commission and prohibited by *Idaho Code* § 61-625. This statute provides that "[a]ll orders and decisions of the commission which have become final and conclusive shall not be attacked collaterally." Answer at 6-7 *citing Idaho Code* § 61-625. Thus, Idaho Power argues that the law of the case is now settled and the Commission's *June 2011 Order* cannot be attacked on appeal or collaterally. *Id.* at 7. Idaho Power notes that the Idaho Supreme Court has explained that

> the legislature has afforded the orders of the [Idaho Public Utilities] Commission a degree of finality similar to that possessed by the judgments made by a court of law. I.C. § 61-625. . . . Final orders of the Commission should ordinarily be challenged either by petition to the Commission for [reconsideration] or by appeal to this Court as provided by *Idaho Code* § 61-626 and 627; Idaho Const. Art. 5, § 9. *A different rule would lead to endless consideration of matters previously presented to the Commission and confusion about the effectiveness of Commission orders.*

Answer at 8 *quoting Utah-Idaho Sugar Co. v. Intermountain Gas Co.*, 100 Idaho 368, 373-74, 595 P.2d 1058, 1063-64 (1979) (emphasis added).

        Idaho Power observed that the projects do not dispute that they did not file a petition for reconsideration within 21 days of the Commission's *June 2011 Order*. *Id.* at 5-6. Idaho Power insists that final Orders of the Commission must be challenged either by petitioning the Commission for reconsideration, or by appeal to the Idaho Supreme Court as provided by *Idaho Code* §§ 61-626 and 61-627.[7] Idaho Power states that the projects did neither. Answer at 6.

        Having failed to seek reconsideration within 21 days, Idaho Power asserts that Order No. 32255 "was no longer subject to reconsideration, appeal, or review" as of June 30, 2011.

---

[7] Section 61-626(1) provides that after a final Order has been issued, any "person interested therein shall have the right, within twenty-one (21) days after the date of said order, to petition for reconsideration in respect to any matter determined therein." Section 61-627 provides that only after "a petition for reconsideration is denied, or, if the petition is granted, then after the [Commission issues its] decision on reconsideration, the state of Idaho or any party aggrieved may appeal to the Supreme Court. . . ."

ORDER NO. 32664           9

Answer at 7.  The Company also notes that Idaho Appellate Rule (I.A.R.) 21 states that the failure to file a notice of appeal "within the time limits prescribed by these rules, <u>shall be jurisdictional and shall cause automatic dismissal of such appeal or petition</u>. . . ."  Answer at 7 (emphasis added); *Welch v. Del Monte Corp.*, 128 Idaho 513, 516, 915 P.2d 1371, 1374 (1996).

Idaho Power argues that the projects waited more than 14 months after the deadline for reconsideration, "and more than 10 months after the issuance of FERC's Cedar Creek Order," before seeking reversal of the Commission's prior Order.  Answer at 9.  The fact that FERC issued two subsequent orders does not entitle the projects to modification.  The Petition is impermissible collateral attack upon the Commission's final *June 2011 Order* and should be dismissed. *Id.*

2.  <u>Collateral Estoppel</u>.  Idaho Power next claims that the Murphy Petition is barred by the doctrine of collateral estoppel (issues preclusion).  Answer at 10.  The Company maintains that Murphy's "failure to raise judiciable issues in a prior administrative proceeding precludes that [party] from raising them in a later administrative proceeding and in subsequent litigation." *Id. citing Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107-108, 111 S.Ct. 2166, 2169 (1991); Rest. 2d Judgments § 83, cmt. b ("where an administrative forum has the essential procedural characteristics of a court, . . . its determinations should be accorded the same finality as that accorded the judgment of a court.  The importance of bringing a legal controversy to conclusion is generally no less when the tribunal is administrative tribunal than when it is a court.").

Idaho Power asserts the Idaho Supreme Court requires five factors to be met for the doctrine of collateral estoppel to bar re-litigation of an issue decided in an earlier proceeding.  As delineated by the Court in *Ticor Title Co. v. Stanion*, 144 Idaho 119, 124, 157 P.3d 613, 618 (2007), the five factors are:

> (1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation.

Answer at 10.

Idaho Power maintains that all five factors are satisfied in the Commission's *June 2011 Order*. More specifically, Idaho Power insists the Murphy projects had ample opportunity to make their case prior to issuance of the *June 2011 Order* and they could have reiterated their arguments in a petition for reconsideration. *Id.* Idaho Power insists that the projects' Petition seeking approval of the three PPAs is "the identical issue the Commission ruled on in the [*June 2011 Order*]." *Id.* at 11; Murphy Wind Petition at 13. Addressing the third factor, Idaho Power states that the Commission's *June 2011 Order* is the identical issue raised in the current Petition and was expressly decided in the prior Order. *Id.* Finally, Idaho Power avers that "Murphy Wind is the same party, or has privity with, the party bound by the [*June 2011 Order*]." *Id.* Consequently, having met all five factors, the projects are "colleratally estopped from being heard on the same issues again before this Commission." *Id.*

3. *Res Judicata*. Idaho Power also argues the Petition is barred by the doctrine of *res judicata* (claim preclusion). "In Idaho, '*res judicata* means that in an action between the same parties upon the same claim or demand, the former adjudication concludes parties and privies not only as to every matter offered and received to sustain or defeat the claim but also every matter which might and should have been litigated in the first suit.'" *Id.* at 11 *quoting Magee v. Thompson Creek Mining Co.*, 152 Idaho 196, 202, 268 P.3d 464, 470 (2012) (internal quotations omitted); *Idaho Code* § 61-625. *Res judicata* applies to decisions of Idaho administrative agencies. *Magee*, 152 Idaho at 202, 268 P.3d at 470 (2012).

For purposes of applying the doctrine of *res judicata*, the "sameness" of a cause of action "is determined by examining the operative fact underlying the two lawsuits." Answer at 11 *quoting Farmers Nat'l Bank v. Shirley*, 126 Idaho 63, 69, 878 P.2d 762, 768 (1994) (internal citation and quotations omitted). Idaho Power argues that the Petition seeks an Order finding that a legally enforceable obligation arose prior to December 14, 2010. "This is the same claim that the Commission considered and rejected, in the June [2011 Order], and which Murphy Wind elected not to petition for reconsideration or appeal to the Idaho Supreme Court." Answer at 11-12. Idaho Power asserts that because the projects

> already brought an identical claim before the Commission, and that claim resulted in a final judgment, Murphy Wind is barred by *res judicata* from bringing that same claim to this Commission again. The existence of FERC's Declaratory Order does not constitute authority to, nor require the Commission to set aside *Idaho Code* §§ 61-625, 61-627 and I.A.R. 14(b) and 21, and resuscitate a conclusive order in a closed docket.

*Id.*  Consequently, Idaho Power concludes that the Petition is also barred by the doctrine of *res judicata*.

      4.  <u>Disputed Facts</u>.  Idaho Power next argues that the Commission need not decide whether a legally enforceable obligation arose prior to December 14, 2010, because the parties entered into a subsequent written agreement.  *Id.* at 13.  Despite the Murphy projects' claim to the contrary, Idaho Power asserts there are disputed facts regarding whether a legally enforceable obligation existed.  *Id.* at 14.  While Idaho Power alleges these disputed facts "are numerous," it particularly asserts that there is a legitimate question whether Brian Jackson (American Wind Group) was actually authorized to sign the three Murphy Agreements.  *Id.* at 14.  Idaho Power reports that it received several calls from one of the projects' partners questioning who was authorized to sign the three PPAs.  Given this uncertainty, "Idaho Power could not verify whether the signature [on the PPAs] was authorized until December 15, 2010.  This is but one of many factual issues in dispute."  *Id.*

      5.  <u>The Prior Rates are Unreasonable</u>.  Finally, Idaho Power questions how the Commission would determine the appropriate avoided cost rate for the three PPAs when it has subsequently found that the then avoided cost rates were unjust and unreasonable and no longer in the public interest in the Commission's GNR-E-11-03 case.  Answer at 14-15.  In the 11-03 case the Commission found that the avoided cost "methodologies previously approved by this Commission, as utilized and applied by Idaho Power, do not currently produce rates that reflect Idaho Power's avoided costs and are not just and reasonable nor in the public interest."  *Id.* at 4 *quoting* Order No. 32498 at 2 (March 22, 2012).  Consequently, Idaho Power states that the Commission cannot approve the rates contained in the three PPAs after it has subsequently found those same rates to be neither just and reasonable, nor in public interest.  Thus, Murphy Wind's request to reverse the *June 2011 Order* "is contrary to the public interest, should be denied, and [the] Petition [should] be dismissed."  *Id.* at 18.

**THE MURPHY PROJECTS' REPLY**

      On September 14, 2012, the Murphy projects submitted an abbreviated reply.  Rather than respond to the arguments raised by Idaho Power in its answer, the projects state that those arguments "simply are wrong, as we believe will be obvious to the Commission.  However,

rather than respond here, Murphy Flat wishes to notify Idaho Power and the Commission that it will be filing a *Petition for Enforcement*" with FERC.[8]  Reply at 2-3.

The Murphy projects also responded to the Commission's inquiry regarding assignment of the PPAs. They disclosed that on May 16, 2012, they signed an "Asset Purchase Agreement" with a newly formed LLC, Murphy Flat Power, which is wholly owned by First Wind Energy. Reply at 2. The reply further reports that on June 6, 2012, the owners of the Murphy projects "transferred and assigned to First Wind, and First Wind took possession of, all . . . Murphy Flat assets. . . ." *Id.* The three PPAs "were part of the assets assigned to First Wind." *Id.* Although the Murphy projects and First Wind asked Idaho Power to consent to the assignment of the PPAs, they insist that Idaho Power "unreasonably" refused to consent to the assignment. *Id.*

## DISCUSSION AND FINDINGS

It is well settled that the Commission has been granted authority to implement PURPA, review QF contracts, and resolve disputes between QFs and electric utilities. *Idaho Code* §§ 61-502, 61-503; *A.W. Brown v. Idaho Power*, 121 Idaho 812, 816, 828 P.2d 841, 845 (1992); *Empire Lumber Co. v. Washington Water Power*, 114 Idaho 191, 755 P.2d 1229 (1987). We have implemented PURPA guidelines and standards by issuing general procedures and engaging in case-by-case analysis. *Rosebud Enterprises v. Idaho PUC*, 128 Idaho 609, 615, 917 P.2d 766, 772 (1996); Order No. 15746, 38 P.U.R. 4th 352 (1980. In this Petition, the Murphy projects have asked the Commission to reverse its decision made in the *June 2011 Order* and instead approve the three PPAs pursuant *Idaho Code* § 61-624. Based upon the findings set out below we deny the Petition.

### A. Assignment

In Scheduling Order No. 32629, we directed Idaho Power and the Murphy projects to disclose whether the three PPAs in this case have been assigned to another entity. Order No. 32629 at 4. Each PPA contains an assignment provision which states in part: "<u>no assignment [of this Agreement] by either Party shall become effective without the written consent of both</u>

---

[8] On September 25, 2012, the Murphy projects filed a Petition with FERC seeking an enforcement action against this Commission. Docket No. EL12-108-000. The FERC docket is pending.

Parties being first obtained.  Such consent shall not be unreasonably withheld."  Agreement §
22.1 (emphasis added).[9]

In their reply, the Murphy projects disclosed that their assets had been "transferred
and assigned" to a newly formed limited liability company (Murphy Flat Power) which is wholly
owned by First Wind Energy, LLC.  Reply at 2.  The reply further states that the Murphy
projects (the "Assignors") transferred to Murphy Flat Power and First Wind Energy (collectively
the "Assignees") all "interest in Murphy Flat assets" on June 6, 2012.  *Id.*  "The three [PPAs]
were part of the assets assigned to First Wind."  *Id.*  The Assignors and Assignees contend they
"asked Idaho Power to consent to the assignment of the [PPAs], but Idaho Power unreasonably
and in bad faith refused to do so. . . ."  *Id.*

In its answer, Idaho Power declared that "it has not consented to the [assignment of
the three PPAs to] any entity.  An entity called First Wind requested consent to assignment of the
PPAs, but Idaho Power refused [because] those PPAs were not approved by the Commission,
and therefore not effective . . . to assign."  Answer at 2, n.1.

Based upon the comments, we find the Murphy projects (the Assignors) are in privity
with Murphy Flat Power and First Wind (the Assignee).  The Assignees acknowledge that they
entered into an Asset Purchase Agreement with the Assignors where the Assignees took "all
right title and interest in [the] Murphy [projects'] assets" including the three PPAs.  Reply at 2.
Under Idaho law an assignor is in privity with an assignee.  *Foster v. City of St. Anthony*, 122
Idaho 883, 889, 841 P.2d 413, 419 (1992).  The Asset Purchase Agreement was closed June 6,
2012, and the Petition filed subsequently.  From these facts we can reasonably find and infer that
the Assignees (Murphy Power and First Wind) have filed the current Petition in an attempt to
revive the same PPAs disapproved by the Commission more than 14 months ago.

Under Idaho law, where "the language of a contract is clear and unambiguous, its
interpretation and legal effect are questions of law.  An unambiguous contract will be given its
plain meaning."  *Shawver v. Huckleberry Estates*, 140 Idaho 354, 361, 93 P.3d 685, 692 (2004)
(internal citations omitted).  Based upon our review of the PPAs, we find that the assignment
provision of the Agreements is clear and unambiguous.  The provision provides that assignment

---

[9]  In addition, Section 18.1 of each Agreement provides that the Agreement "shall be construed and interpreted in
accordance with the laws of the State of Idaho. . . ."  Section 18.2 also provides that "Venue for any litigation arising
out of or related to this Agreement will lie in the District Court of the Fourth Judicial District of Idaho in and for the
County of Ada."

of the PPA shall not become effective "without the written consent of both Parties being first obtained." Agreement § 22.1.

Despite the Murphy projects (i.e., the Assignees) allegation that Idaho Power acted unreasonably in refusing to consent to the assignment of the PPAs, we find this argument unpersuasive. Given the Commission's decision to disapprove the PPAs, the failure of the projects to timely seek reconsideration, and the passage of 14 months, we do not find it unreasonable for Idaho Power to withhold its consent. *See Haag v. Pollack*, 122 Idaho 605,611, 836 P.2d 551, 557 (Ct. App. 1992). Although the projects may have assigned their other assets to Murphy Power and First Wind, the PPAs clearly conditioned such assignment on Idaho Power's consent – consent it did not give.

### B. The Petition is Time Barred

We note it is undisputed that the Murphy projects did not file a timely petition for reconsideration within 21 days pursuant to *Idaho Code* § 61-626(1). The procedures for review of Commission final Orders are well settled. The Idaho Constitution provides that the Idaho Supreme Court "shall have jurisdiction to review, upon appeal, . . . any order of the public utilities commission . . .; the legislature <u>may provide conditions of appeal, scope of appeal, and procedure on appeal from orders of the public utilities commission. . . .</u>" Idaho Const. Art. V, § 9 (emphasis added). *Idaho Code* § 61-627 sets out the "conditions, scope, and procedures" for an appeal from an Order of the Commission. This section provides is pertinent part:

> <u>After a petition for reconsideration is denied, or,</u> if the petition is granted, then <u>after the rendition of the decision on reconsideration,</u> the state of Idaho or any party aggrieved may appeal to the supreme court from any order of the public utilities commission by filing a notice of appeal and serving the same in the manner provided by the rules of the supreme court.

*Idaho Code* § 61-627 (emphasis added). Parties aggrieved by a Commission Order must exhaust their administrative remedies (i.e., seek reconsideration) before appealing to the Idaho Supreme Court. *Id.* The purpose of reconsideration is to bring to the Commission's attention any alleged error and allow the Commission to rectify any mistake or omission. *Washington Water Power v. Kootenai Environmental Alliance*, 99 Idaho 875, 591 P.2d 122 (1979). Thus, before a party may file an appeal, it must have filed a petition for reconsideration thereby exhausting its administrative remedies. *See Eagle Water Co. v. Idaho PUC*, 130 Idaho 314, 940 P.2d 1130 (1997).

Returning to the facts of this case, the Murphy projects waited more than 14 months before seeking redress from the Commission. Although they had a statutory right to ask the Commission to reconsider its *June 2011 Order*, they failed to seek reconsideration within the statutory deadline of 21 days. *Idaho Code* § 61-626(2). Having failed to timely pursue their administrative remedy, the projects' Petition is time barred by the deadline contained in *Idaho Code* § 61-626(1). In *Utah-Idaho Sugar v. Intermountain Gas*, our Supreme Court observed that the "legislature has afforded the orders of the Commission a degree of finality similar to that possessed by judgments made by a court of law." 100 Idaho 368, 373, 597 P.2d 1058, 1063 (1979). In that case, the Court noted that the Commission has a specific statute that provides that "all orders and decisions of the commission which shall have become final and conclusive shall not be attacked collaterally." *Idaho Code* § 61-625. The Court concluded that final Orders of the Commission should ordinarily be challenged either by petition to the Commission for [reconsideration] or by appeal to this Court as provided by *Idaho Code* §§ 61-626 and -627; Idaho Const. Art. V, § 9. A different rule would lead to endless consideration of matters previously presented to the Commission and confusion about the effectiveness of Commission Orders. *Utah-Idaho Sugar*, 100 Idaho at 373-74, 597 P.2d at 1063-64; *Eagle Water*, 130 Idaho at 317, 940 P.2d at 1135.

We find the Supreme Court's opinion in *Eagle Water* instructive in this case. In that case, an adjacent water utility filed a petition for reconsideration from a final Order and Eagle Water filed a cross-petition for reconsideration. Eagle Water did not file its own petition for reconsideration. 130 Idaho at 316, 940 P.2d at 1135. The Court noted that a party seeking judicial review of an Order of the Commission must comply with *Idaho Code* §§ 61-626 and 61-627. The Court declined to consider the issues raised by Eagle Water in its subsequent appeal "because Eagle Water did not file a timely petition for reconsideration." 130 Idaho at 317, 940 P.2d at 1136 (emphasis added). The Court also stated that "it is a well settled rule that . . . where the objections [to a Commission Order] were not raised in the petition for [reconsideration], they will not be considered by this Court." *Id.* at 316-17, 940 P.2d at 1135-36 *quoting Key Transport v. Trans Magic Airlines*, 96 Idaho 110, 112-13, 524 P.2d 1338, 1340-41 (1974).[10]

---

[10] More recently, our Supreme Court has stated that a "party seeking judicial review must 'run the full gamut of administrative proceedings before an application of judicial relief may be considered'". *Hart v. State Tax Commission*, ___ Idaho ___, ___ P.3d ___, 2012 WL 1434336 (April 26, 2012) (subject to revision or withdrawal citing) *quoting Park v. Banbury*, 143 Idaho 576, 578, 149 P.3d 851, 853 (2006). In that case, the taxpayer filed his

A review of the statutory history surrounding *Idaho Code* § 61-626 is also instructive in this instance. Prior to 1957, Section 61-626 did not contain a specific time requirement for filing a petition for reconsideration. In 1957, our Legislature amended this section to require that a petition for reconsideration be filed "within twenty (20) days after the date of said order." 1957 Idaho Sess. Laws, Ch. 126. Again, in 1984 the Legislature amended Section 61-626 changing the deadline for filing a petition for reconsideration from 20 days to 21 days. 1984 Idaho Sess. Laws, Ch. 110. As the preamble to House Bill 457 noted, changing the deadline for petitions for reconsideration dovetails with the appellate rules which utilize seven-day increments in establishing filing deadlines. *Id.* Thus, our Legislature has enacted a statutory scheme for review of Commission Orders with specific jurisdictional deadlines. *Idaho Code* § 61-626 bars relief in this case when the Petition was filed more than 14 months after issuance of the Commission's *June 2011 Order*.

## C. Res Judicata

Idaho Power argues that the Petition is barred by the doctrines of *res judicata* and collateral estoppel. As our Supreme Court explained in *Ticor Title Co. v. Stanion*, the "doctrine of *res judicata* covers both claim preclusion (true *res judicata*) and issue preclusion (collateral estoppel)." 144 Idaho 119, 123, 157 P.3d 613, 617 (2007). The Court also distinguished the differences between claim preclusion (true *res judicata*) and issue preclusion (collateral estoppel). "Claim preclusion bars a subsequent action between the same parties upon the same claim or upon claims 'related to the same cause of action . . . which might have been made.'" Issue preclusion protects litigants from litigating an identical issue with the same party or its privity. *Id.* (internal citation omitted). The Court in *Ticor* held that *res judicata* serves three fundamental purposes:

> (1) it preserves the acceptability of judicial dispute resolution against the corrosive disrespect that would follow if the same matter were twice litigated to inconsistent results; (2) it serves the public interest in protecting the courts against the burdens of repetitious litigation; and (3) it advances the private interest in repose from the harassment of repetitive claims.

*Id.*; *Hindmarsh v. Mock*, 138 Idaho 92, 94, 57 P.3d 803, 805 (2002).

---

appeal of a State Tax Commission decision nearly three months after the taxpayer's petition to the district court was required. *Id.* at *1, 2 *citing Idaho Code* § 63-3812(a).

The United States Supreme Court and the Idaho Supreme Court have held that the doctrine of *res judicata* applies to agency decisions. *Astoria Fed. Sav. & Loan Assoc. v. Solimino*, 501 U.S. 104, 107-08, 1111 S.Ct. 2166, 2169 (1991) ("We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality."); *University of Tennessee v. Elliott*, 478 U.S. 788, 798, 106 S.Ct. 3220, 3225-26 (1986); *Magee v. Thompson Creek Mining Co.*, 152 Idaho 196, 268 P.3d 464 (2012); *Welch v. Del Monte Corp.*, 128 Idaho 513, 915 P.2d 1371 (1976). In Idaho, "the doctrine of *res judicata* means that 'in action between the same parties upon the same claim or demand, the former adjudication concludes parties and privities not only as to every matter offered and received to sustain or defeat the claim but also every matter which might and should have been litigated in the first suit.'" *Magee*, 152 Idaho at 202, 268 P.3d at 470 *quoting Farmers Nat'l Bank v. Shirey*, 126 Idaho 63, 70, 878 P.2d 762, 769 (1994).

There are three requirements that must be met for claim preclusion to bar a subsequent action. For a claim preclusion to apply, there must be: (1) the same parties; (2) the same claim; and (3) a final judgment. *Ticor*, 144 Idaho at 124, 157 P.3d at 618. Idaho Power and the three Murphy projects were parties in the *June 2011 Order*. For purposes of *res judicata*, we find Murphy Flat Power and First Wind are in privity with the Murphy projects, and the projects were parties to the Commission's *June 2011 Order*. *Schuler v. Ford*, 10 Idaho 739, 80 P. 219 (1905) ("every person is privy to a judgment or decree who has succeeded to an estate or interest held by one who was a party to such judgment or decree, if the succession occurs after the bringing of the action."). In *Schuler*, the Court noted that "it is well settled that a judgment is conclusive not only to those who were actual parties to the litigation, but also upon all persons who are in privity with them." *Id.* at 746, 80 P. at 220 quoting *Black on Judgments*, Vol. 2, § 549.

Turning to the second requirement, claim preclusion "bars adjudication not only on the matters offered and received to defeat the claim, but also as to 'every matter which might and should have been litigated in the first suit.'" *Ticor*, 144 Idaho at 126, 157 P.3d at 620 *quoting Magic Valley Radiology v. Kolouch*, 123 Idaho 434, 437, 849 P.2d 107, 110 (1993) (internal quotations and citations omitted). In other words, when the Commission issued its final Order in the prior Murphy proceeding, that Order "extinguishes all claims arising out of the same

ORDER NO. 32664                           18

transaction or series of transactions out which the cause of action arose." *Id. quoting Diamond v. Farmers Group*, 119 Idaho 146, 150, 804 P.2d 319, 323 (1990). The Court noted in *Ticor* that "the transactional concept of a claim is broad." *Id.* Returning to the facts of this case, the Murphy projects urge us to modify the *June 2011 Order* based upon FERC's rulings in *Cedar Creek* and *Rainbow*. Petitions at 3. More specifically, the Petitioners maintain that a legally enforceable obligation arose by at least December 13, 2010. *Id.* at 3-4. In addition, they maintain that the *Cedar Creek* and *Rainbow* orders represent "new facts or information not available at the time the order was issued." *Id.* at 3, n.6.

We find the second requirement met for several reasons. First, despite the projects' arguments to the contrary, the underlying facts surrounding the Murphy projects and PPAs in the first proceeding and the current Petition arise out of the same transaction – they have not changed and do not constitute "new facts." What has changed is that the projects have advanced a new legal argument as to why the Commission should modify its prior Order. Second, a review of the record in this case reveals that the term "legally enforceable obligation" does not appear in the first proceeding but was first used by the Petitioners 14 months after the Commission issued its *June 2011 Order* and after the assets of the Murphy projects were assigned to Murphy Flat Power and First Wind. Thus, we find that the projects' argument that they had perfected a legally enforceable obligation arose out of the same transaction as in the prior proceeding. Third, the Murphy Petition relies entirely on the record developed in the prior consolidated record for the three Murphy projects and resulted in the Commission's final *June 2011 Order*. Consequently, we find that the claims in the Petition could have been litigated in the first proceeding but the projects failed to do so. The new claims advanced by the projects are barred by the doctrine of claim preclusion.

Finally, there is little doubt that the Commission's *June 2011 Order* represented a final Order and decision on the matter. Aggrieved parties such as the projects have a statutory right to seek reconsideration from the Commission. They failed to do so. Moreover, the Murphy projects offered no rebuttal to Idaho Power's *res judicata* arguments. In conclusion, we find that the *June 2011 Order* resulted in a final judgment on the same claims between the same parties (or privies) as in the present Petition. Consequently, the application of claim preclusion at this late date effectively bars the Murphy projects from raising the claims in the present Petition because such claims were raised or should have been raised in the prior case.

ORDER NO. 32664                    19

### C. Collateral Estoppel

In Idaho, courts have set out five requirements for collateral estoppel (issue preclusion) to bar re-litigation of an issue decided in an earlier proceeding:

> (1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation.

*Ticor*, 144 Idaho at 124, 157 P.3d at 618 (internal citations omitted). We find all five factors have been met to bar modification of the Commission's *June 2011 Order*.

First, we find that the Murphy projects had a full and fair opportunity to litigate the issues decided in the Commission's prior proceeding and final Order. The Murphy projects filed two sets of written comments in the prior case. Despite the statutory right to petition the Commission for reconsideration, the Murphy projects failed to do so. Second, in the Commission's prior Order, we found that the issue to be decided was whether to approve the PPAs – the same issue raised in the current Petition. Third, we found that the executed contract was controlling and that it was not effective until after December 14, 2010. Order No. 32255. The Commission also found that it was not in the public interest to allow parties with contracts executed on or after December 14, 2010, to avail themselves of an eligibility cap that was no longer applicable. *Id.* at 8-9. Fourth, we further find that our *June 2011 Order* No. 32255 was a final Order based upon the merits in the prior proceeding. Finally, we find that the Murphy projects were parties in the prior proceeding, and in privity with Murphy Flat Power and First Wind. *Ticor*, 144 Idaho at 124, 157 P.3d at 618. We conclude that the doctrine of collateral estoppel precludes re-litigation of every matter or issue that was litigated in the first suit. *Magee*, 152 Idaho at 202, 268 P.3d at 470. The issue of whether to approve the three PPAs was litigated in the prior proceeding more than 14 months ago.

The law of the case is now settled and the doctrine of *res judicata* bars a subsequent attack on the Commission's *June 2011 Order*. As the U.S. Supreme Court held in *Federated Depart. Stores v. Moitie*:

A final judgment on the merits of an action precludes <u>the parties or their</u>
<u>privies from re-litigating issues that were or could have been raised in that</u>
<u>action</u>. Nor are the res judicata consequences of a final, unappealed judgment
on the merits altered by the fact that the judgment may have been wrong or
rested on a legal principle subsequently overruled in another case. . . . As this
Court explained *Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 325 (1927) . . .
"A judgment merely avoided because based upon an erroneous view of the law
is not open to collateral attack but <u>can be corrected only by a direct review</u> and
not by bringing another action upon the same cause [of action]."

452 U.S. 394, 398, 101 S.Ct. 2424, 2428 (1981) (emphasis added and internal citations omitted);
*see also Idaho Code* § 61-625 ("all orders and decisions of the commission which have become
final and conclusive shall not be attacked collaterally."). The doctrine of *res judicata* is
supported by strong policy considerations. As previously mentioned, the Legislature has
afforded "orders of the commission a degree of finality similar to that possessed judgments made
by a court of law." *Utah-Idaho Sugar*, 100 Idaho at 373-74, 597 P.2d at 1064.

The Murphy projects urge us to exercise our discretion and amend our prior Order
No. 32255. "The [trier of fact] does not abuse its discretion if it (1) correctly perceives the issue
as discretionary, (2) acts within the bounds of discretion and applies the correct legal standards,
and (3) reaches the decision through an exercise of reason." *Fragnella v. Petrovich*, 153 Idaho
266, 281 P.3d 103, 114 (2012) (internal citations omitted), *citing West Wood Invs. Inc. v. Acord*,
141 Idaho 75, 82, 106 P.3d 401, 408 (2005).

Given the passage of time, the statute of limitation in *Idaho Code* § 61-626(1), the
finality of the Commission's prior Order, and the *res judicata* bar applicable to the Petition, we
decline to modify our prior Order No. 32255. In addition, although Section 61-624 states that
the Commission "may at any time" amend a prior Order, such authority is used sparingly and
must be read in conjunction with other sections of the Public Utilities Law. The authority to
amend or modify is applicable when the Commission amends a prior Order under Section 61-
626(3) on reconsideration, and on remand from the Supreme Court under Section 61-629.[11]
These two latter statutes establish the scope of when the Commission "may" amend a prior

---

[11] Section 61-626(3) provides that if after reconsideration the Commission "shall be of the opinion that the original
order or any part thereof is in any respect unjust or unwarranted or should be changed, the commission may abrogate
or change the same. In order made after any such reconsideration, abrogating or changing the original order, shall
have the same force and effect as an original order. . . ." Likewise, Section 61-629 provides that if the Supreme
Court sets aside a Commission Order or a part of the Commission Order, the Commission "may alter or amend the
order appealed from to meet the objections of the court in the manner prescribed in section 61-624."

ORDER NO. 32664                              21

Order. The Commission's ability to amend an Order cannot be used to create a right of appeal or other remedy lost by a party's lack of diligence. Given the facts of this case and the reasons set out above, we decline to reverse our prior final Order No. 32255.

In summary, we decline the Murphy projects' invitation to modify our prior Order No. 32255 and approve the three PPAs. As set out in greater detail above, the Commission denies the Murphy projects' request to reverse our prior Order because they failed to timely file a petition for reconsideration and are time-barred from requesting such relief at this late date. We further find that the Petition is barred by the doctrine of *res judicata* (both claim preclusion and issue preclusion). The Petition represents an impermissible collateral attack on the Commission's final Order No. 32255 prohibited by *Idaho Code* § 61-625.

## ORDER

IT IS HEREBY ORDERED that the Petition for Modification filed by the Murphy projects is denied. Idaho Power's Motion to Dismiss the Petition is granted.

THIS IS A FINAL ORDER. Any person interested in this Order (or in issues finally decided by this Order) or in interlocutory Orders previously issued in this Case Nos. IPC-E-10-56, IPC-E-10-57, and IPC-E-10-58 may petition for reconsideration within twenty-one (21) days of the service date of this Order with regard to any matter decided in this Order or in interlocutory Orders previously issued in these cases. Within seven (7) days after any person has petitioned for reconsideration, any other person may cross-petition for reconsideration. See *Idaho Code* § 61-626.

DONE by Order of the Idaho Public Utilities Commission at Boise, Idaho this 12th day of October 2012.

RAUL KJELLANDER, PRESIDENT

MACK A. REDFORD, COMMISSIONER

MARSHA H. SMITH, COMMISSIONER

ATTEST:

Jean D. Jewell
Commission Secretary

bls/O:IPC-E-10-56_IPC-E-10-57_IPC-E-10-58_dh2

# PUC EXHIBIT 2

# ORDER NO. 32299

Office of the Secretary

Service Date

July 27, 2011

# BEFORE THE IDAHO PUBLIC UTILITIES COMMISSION

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF IDAHO POWER COMPANY FOR A DETERMINATION REGARDING A FIRM ENERGY SALES AGREEMENT BETWEEN IDAHO POWER AND GROUSE CREEK WIND PARK, LLC | ) ) ) ) ) ) ) | CASE NO.  IPC-E-10-61 |
| IN THE MATTER OF THE APPLICATION OF IDAHO POWER COMPANY FOR A DETERMINATION REGARDING A FIRM ENERGY SALES AGREEMENT BETWEEN IDAHO POWER AND GROUSE CREEK WIND PARK II, LLC | ) ) ) ) ) ) ) | CASE NO.  IPC-E-10-62<br><br>ORDER NO.  32299 |

On December 29, 2010, Idaho Power Company filed two Applications each requesting acceptance or rejection of a 20-year Firm Energy Sales Agreement ("Agreements") between Idaho Power and Grouse Creek Wind Park, LLC, and Grouse Creek Wind Park II, LLC (collectively "the Projects"). Both projects are located near Lynn, Utah, and managed by Wasatch Wind Intermountain, LLC (Wasatch Wind). On February 24, 2011, the Commission issued a consolidated Notice of Application and Notice of Modified Procedure for the two Applications. Timely comments in response to the Notice of Modified Procedure were filed by the Commission Staff and the Projects. On March 31, 2011, Idaho Power filed reply comments.

On April 7, 2011, Wasatch Wind filed a Motion to Set Time for Oral Argument because "the records in these cases are lengthy and Idaho Power appears to interpret the evidence different than the Grouse Creek QFs. . . ." Motion at 5. Commission Staff and Idaho Power filed objections to the Projects' Motion. On April 27, 2011, the Commission issued an Order denying the Projects' Motion. The Commission found that "the evidentiary record sufficiently reflects the positions of all parties." Order No. 32236 at 2.

On June 8, 2011, the Commission issued a consolidated final Order disapproving the two Agreements. Order No. 32257 at 10. The Commission found that the Agreements "were not fully executed (signed by both parties) prior to December 14, 2010" – the date that the Commission lowered the eligibility cap for the published avoided cost rate from 10 MW to 100

kW. Thus, the Agreement contained an essential term that was no longer available to the Projects. *Id.*

On June 29, 2011, the Projects timely filed a Joint Petition for Reconsideration of the Commission's final Order. The Projects allege that the Commission's final Order is arbitrary and capricious, is not in conformity with controlling federal or Idaho state case law, and is a violation of the rulemaking requirements of the Idaho Administrative Procedures Act.

Idaho Power filed an answer to the Projects' Petition on July 6, 2011. Idaho Power maintains that the Commission's final Order is based on substantial and competent evidence. Idaho Power argues that the Commission was acting within its discretion and, therefore, reconsideration should be denied.

## BACKGROUND

### A. The Agreements

On December 28, 2010, Idaho Power and the two wind projects entered into their respective Agreements. Under the terms of the Agreements, each wind project agrees to sell electric energy to Idaho Power for a 20-year term using the 10 aMW non-levelized published avoided cost rates. Applications at 4. The nameplate rating of each project is 21 MW. Under normal and/or average conditions, each QF will not exceed 10 aMW on a monthly basis. Idaho Power warrants that the Agreements comport with the terms and conditions of the various Commission Orders applicable to PURPA agreements for a wind resource. *Id.* at ¶ 6 *citing* Order Nos. 30415, 30488, 30738 and 31025.

Each project has selected June 1, 2013, as the Scheduled First Energy Date and December 1, 2013, as the Scheduled Operation Date. Applications at 5. Idaho Power asserts that various requirements have been placed upon the projects in order for Idaho Power to accept the project's energy deliveries. Idaho Power states that it will monitor each project's compliance with initial and ongoing requirements through the term of the Agreement. The parties have agreed to liquidated damage and security provisions of $45 per kW of nameplate capacity. Agreements ¶¶ 5.3.2, 5.8.1.

Idaho Power asserts that it has advised each project of the project's responsibility to work with Idaho Power's delivery business unit to ensure that sufficient time and resources will be available for the delivery unit to construct the interconnection facilities, and transmission upgrades if required, in time to allow the projects to achieve their December 1, 2013, Scheduled

Operation Date.  The Applications state that the projects have been advised that delays in the interconnection or transmission process do not constitute excusable delays and if a project fails to achieve its Scheduled Operation Date, delay damages will be assessed.  Applications at 6. The Applications further maintain that each project has acknowledged and accepted the risk inherent in proceeding with its Agreement without knowledge of the requirements of interconnection and possible transmission upgrades. *Id.* at 7.

Idaho Power also states that each project has been made aware of and accepted the provisions in the Agreements and Idaho Power's approved Schedule 72 regarding non-compensated curtailment or disconnection of the project should certain operating conditions develop on Idaho Power's system.   The Applications note that the parties' intent and understanding is that "non-compensated curtailment would be exercised when the generation being provided by the Facility in certain operating conditions exceeds or approaches the minimum load levels of [Idaho Power's] system such that it may have a detrimental effect upon [Idaho Power's] ability to manage its thermal, hydro, and other resources in order to meet its obligation to reliably serve loads on its system." *Id.*

By their own terms, the Agreements will not become effective until the Commission has approved all of the terms and conditions and declares that all payments made by Idaho Power to each project for purchases of energy will be allowed as prudently incurred expenses for ratemaking purposes.  Agreements ¶ 21.1.

### B. The Utilities' Joint Petition

On November 5, 2010, prior to the date that Idaho Power and the Projects entered into their Agreement, Idaho Power, Avista Corporation, and PacifiCorp dba Rocky Mountain Power filed a Joint Petition requesting that the Commission initiate an investigation to address various avoided cost issues related to the Commission's implementation of PURPA.  Case No. GNR-E-10-04.  On December 3, 2010, the Commission issued Order No. 32131 declining a motion made by the utilities to <u>immediately</u> reduce the published avoided cost rate eligibility cap from 10 aMW to 100 kW.  Order No. 32131 at 5.  However, the Order did notify parties that the Commission's decision regarding whether to reduce the published avoided cost eligibility cap would become effective on December 14, 2010. *Id.* at 5-6, 9.

Section 210 of PURPA generally requires electric utilities to purchase power produced by QFs at "avoided cost" rates set by the Commission.  "Avoided costs" are those costs

which a public utility would otherwise incur for electric power, whether that power was purchased from another source or generated by the utility itself." 18 C.F.R. § 292.101(b)(6). Order No. 32176 at 1. Under PURPA regulations issued by the Federal Energy Regulatory Commission (FERC), the Commission must "publish" avoided cost rates for small QFs with a design capacity of 100 kW or less. Order No. 32176 at 1. However, the Commission has the discretion to set eligibility for the published avoided cost rate at a higher capacity amount – commonly referred to as the "eligibility cap." 18 C.F.R. § 292.304(c)(1-2). When a QF project is larger than the Commission-established eligibility cap the avoided cost rate for the project must be individually negotiated by the QF and the utility using the Integrated Resource Plan (IRP) Methodology. Order No. 32176.

The purpose of utilizing the IRP Methodology for large QF projects is to more precisely value the energy being delivered. *Id.* at 10. The IRP Methodology recognizes the individual generation characteristics of each project by assessing when the QF is capable of delivering its resources against when the utility is most in need of such resources. The resultant pricing is reflective of the value of QF energy to the utility. Utilization of the IRP Methodology does not negate the requirement under PURPA that the utility purchase the QF energy.

Based upon the record in the GNR-E-10-04 case, the Commission subsequently found that a "convincing case has been made to temporarily reduce the eligibility cap for published avoided cost rates from 10 aMW to 100 kW for wind and solar only while the Commission further investigates" other avoided cost issues. Order No. 32176 at 9 (emphasis original). On reconsideration, the Commission affirmed its decision to temporarily reduce the eligibility cap for published avoided cost rates from 10 aMW to 100 kW. Order No. 32212. Thus, the eligibility cap for the published avoided cost rate for wind and solar QF projects was set at 100 kW effective December 14, 2010. No party appealed from the Orders in Case No. GNR-E-10-04.

### C. The Prior Final Order in this Case

On June 8, 2011, the Commission issued Order No. 32257 disapproving the Agreements between Idaho Power and each of the wind projects – Grouse Creek Wind Park and

Grouse Creek Wind Park II.[1]  The Commission determined that the Agreements were not fully executed (signed by both parties) prior to December 14, 2010, the date upon which the eligibility for published avoided cost rates changed from 10 aMW to 100 kW for wind and solar projects. Consequently, the Commission found that the rates contained in the Agreements did not comply with Order No. 32176 because each of the projects requesting published avoided cost rates are in excess of 100 kW.  Order No. 32257 at 10.  The "old" 10 aMW published rate is available only to non-wind and non-solar QFs.

The Projects signed the Agreements on December 20, 2010, and Idaho Power signed on December 28, 2010.  The Commission noted that the Agreements contain language regarding the effective date.  The terms of the Agreements unequivocally state that the "Effective Date" of the Agreements is "The date stated in the opening paragraph of this . . . Agreement representing the date upon which this [Agreement] was fully executed by both Parties."  Agreements ¶ 1.10 (emphasis added).  The opening paragraph is dated "this 28 day of December, 2010."  We stated that "[t]he Commission does not consider a utility and its ratepayers obligated until both parties have completed their final reviews and signed the agreement."  Order No. 32257 at 9.  We found that "a thorough review is appropriate and necessary prior to signing Agreements that obligate ratepayers to payments in excess of $230 million" over the 20-year term of the Agreements.  *Id.* The Commission established a bright line rule that for a wind or solar QF larger than 100 kW to be eligible for published avoided cost rates, a Firm Energy Sales Agreement/Power Purchase Agreement must have been executed, i.e., signed by both parties, prior to the December 14, 2010, effective date of the change in eligibility criteria.  *Id.* at 10.  The Commission additionally found that it was "not in the public interest to allow parties with contracts executed on or after December 14, 2010, to avail themselves of an eligibility cap that is no longer applicable."  *Id.*

## PETITION FOR RECONSIDERATION

On June 29, 2011, the Projects filed a timely Joint Petition for Reconsideration. *Idaho Code* § 61-626.  The Projects allege that the Commission's Order is arbitrary and capricious and not in conformity with state or federal law.  Specifically, the Projects raise four arguments:  (1) a QF is entitled to the rates that are in effect on the date the QF incurred a legally

---

[1] The two projects had previously filed consolidated comments maintaining that the "relevant facts for each of these two projects are substantially similar."  Project Comments at n.1.  Consequently, the Commission found it reasonable and appropriate to consolidate the cases and issue a consolidated final Order.  Order No. 32257 n.1.

ORDER NO. 32299                                5

enforceable obligation; (2) the Commission's bright line rule is contrary to controlling Idaho case law regarding contract formation; (3) the Commission erroneously failed to apply "grandfather tests" to determine the Projects' eligibility for published rates; and (4) the Commission's bright line rule is in violation of the rulemaking requirements of the Idaho Administrative Procedures Act.   The Projects request that the Commission reconsider its decision and allow "written briefing submitted by the parties, and evidentiary proceedings." Reconsideration at 7.

Idaho Power filed an answer to the Projects' Petition for Reconsideration.   Idaho Power states that the Commission's Order is based on substantial and competent evidence. Idaho Power further maintains that the Commission regularly pursued its authority and was acting within its discretion in choosing to disapprove the Agreements.   Answer at 2. Consequently, Idaho Power asks that the Projects' Petition for Reconsideration be denied.

## ISSUES ON RECONSIDERATION

### A. Legal Standards

Reconsideration provides an opportunity for a party to bring to the Commission's attention any question previously determined and thereby affords the Commission an opportunity to rectify any mistake or omission. *Washington Water Power Co. v. Kootenai Environmental Alliance*, 99 Idaho 875, 879, 591 P.2d 122, 126 (1979).   The Commission may grant reconsideration by reviewing the existing record, by written briefs, or by evidentiary hearing. IDAPA 31.01.01.311.03.   If reconsideration is granted, the Commission must complete its reconsideration within 13 weeks after the deadline for filing petitions for reconsideration. *Idaho Code* § 61-626(2).

Consistent with the purpose of reconsideration, the Commission's Procedural Rules require that petitions for reconsideration "set forth specifically the ground or grounds why the petitioner contends that the order or any issue decided in the order is unreasonable, unlawful, erroneous or not in conformity with the law." Rule 331.01, IDAPA 31.01.01.331.01. Rule 331 further requires that the petitioner provide a "statement of the nature and quantity of evidence or argument the petitioner will offer if reconsideration is granted." *Id.*

### B. Legally Enforceable Obligation – Federal Law

The Projects argue that, pursuant to 18 C.F.R. § 292.304(d)(2)(ii), a QF is entitled to the rates that are in effect on the date the QF incurred a legally enforceable obligation to provide

ORDER NO. 32299                                            6

energy. The Projects maintain that the "obligation to purchase a QF's output is created by the QF committing itself to sell to an electric utility, which also commits the electric utility to buy from the QF." Reconsideration Petition at 5. Based on this premise, the Projects argue that the Commission's Order is arbitrary and capricious and not in conformity with controlling federal law because it requires a utility's signature to establish a legally enforceable obligation.

*Commission Findings*: The Idaho Supreme Court has held that "[t]he implementation of PURPA as it relates to cogeneration and small power producers, and the regulations promulgated by FERC, have been largely left to the regulatory authorities of the individual states." *A.W. Brown Company, Inc. v. Idaho Power Company*, 121 Idaho 812, 816, 828 P.2d 841, 845 (1992). "FERC regulations grant the states latitude in implementing the regulation of sales and purchases between QFs and electric utilities." Order No. 32262 *citing Federal Energy Regulatory Commission v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). As we stated in our final Order, "[a]ccording to the FERC, 'it is up to the States, not [FERC] to determine the specific parameters of individual QF power purchase agreements, including the date at which a legally enforceable obligation is incurred under State law." Order No. 32254 at 9 *citing Rosebud Enterprises v. Idaho PUC*, 128 Idaho 609, 623-624, 917 P.2d 766, 780-781 (1996) *citing West Penn Power Co.*, 71 FERC ¶ 61,153 (1995).

The premise of the Projects' argument is correct: QFs have the right to choose to have rates calculated at the time that a legally enforceable obligation is incurred. Reconsideration at 5. However, this Commission determined that the parties entered into a legally enforceable obligation at the time that both parties executed the power purchase agreement. We find that, for each of these two projects, a legally enforceable obligation was incurred on December 28, 2010. By their very terms the Agreements were not effective until December 28, 2010. Agreements ¶ 1.10. On that date, wind projects larger than 100 kW were no longer entitled to the 10 MW published avoided cost rate. In determining when the parties incurred a legally enforceable obligation, we properly exercised the authority granted us by FERC. "For purposes of [FERC] regulations, the critical date is the date on which a legally enforceable obligation is incurred, and choosing that date for a specific QF is the responsibility of the States, not of [FERC]." *West Penn Power Co.*, 71 FERC ¶ 61,153, 61495 (1995).

The Projects cite *JD Wind 1, LLC*, 129 FERC ¶ 61,148, in support of their proposition that a legally enforceable obligation is incurred at the time the QF commits itself to

sell to an electric utility. In that case, six separate QFs developed by John Deere Renewables petitioned FERC to overturn a Texas PUC decision denying the projects long-term contracts at avoided cost rates calculated at the beginning of the contract. The Texas PUC found that wind QFs were not entitled to long-term legally enforceable obligations because of the intermittent, or non-firm, nature of the resource. FERC concluded that the Texas PUC's Order, limiting the award of a legally enforceable obligation to only those QFs that provide firm power, was inconsistent with FERC regulations implementing PURPA. *JD Wind* does not consider or analyze when a legally enforceable obligation is incurred under PURPA. The Projects' effort to argue that this case is controlling on the issues of contract formation and timing of a legally enforceable obligation is misleading and without merit.

Nothing cited by the Projects demonstrates that the Commission's Order is arbitrary or capricious or inconsistent with federal law. On the contrary, FERC specifically delegated authority to the States to determine when and how a legally enforceable obligation is created. We find that a legally enforceable obligation is incurred and a contract is fully executed upon obtaining the signature of both parties. This finding is based on substantial and competent evidence. The Commission's finding is also in the public interest and strikes a balance between "the local public interest of a utility's electric consumers and the national public interest in development of alternative energy sources." *Rosebud Enterprises*, 128 Idaho at 613, 917 P.2d at 770. Allowing a project to avail itself of an eligibility cap (and therefore published rates) that is no longer applicable could cause ratepayers to pay more than the utility's avoided cost which "would be in direct violation of PURPA policies." *A.W. Brown Company v. Idaho Power Company*, 121 Idaho 812, 818, 828 P.2d 841, 847 (1992). Based on the foregoing, the Projects' request for reconsideration on this issue is denied.

### C. Bright Line Test – Contrary to Idaho Contract Formation Case Law

The Projects argue that the Commission's bright line rule that a firm energy sales agreement/power purchase agreement is not enforceable until it is executed by both parties is erroneous because it is not in conformity with controlling Idaho case law regarding contract formation. Reconsideration at 5. The Projects maintain that the parties satisfied the requirements of contract formation before December 14, 2010, despite the lack of Idaho Power's signature. The Projects cite *Evco Sound & Electronics*, 148 Idaho 357, 365, 223 P.3d 740, 748

(2009), for the proposition that contracts can be enforceable "regardless of whether signed by either party." Reconsideration at 5.

   *Commission Findings*:  As a threshold matter, we note that a firm energy sales agreement/power purchase agreement differs from a standard offer and acceptance contract. Unlike standard offer and acceptance contracts, PURPA agreements are subject to review and approval by this Commission pursuant to Idaho statutes.  *Idaho Code* §§ 61-502 and 61-503. "The Commission, as part of its statutory duties, determines reasonable rates and investigates and reviews contracts." *A.W. Brown Company v. Idaho Power Company*, 121 Idaho 812, 816, 828 P.2d 841, 845 (1992).  Thus, QF power purchase agreements are different from typical or standard contracts.  Furthermore, the Court's analysis supports our decision in this case.  In *Evco Sound*, the Idaho Supreme Court stated that a meeting of the minds "is evidenced by a manifestation of intent to contract which takes the form of an offer <u>and acceptance</u>." *Evco Sound & Electronics, Inc. v. Seaboard Surety Company*, 148 Idaho 357, 365, 223 P.3d 740, 748 (2009) (emphasis added).  Here we find that Idaho Power did not accept the Projects' offer to sell power until after it completed a final review of the contract terms and conditions and signed the Agreement.

   Prior to signing, Idaho Power performs a thorough review of the terms of the contract.  As we stated in our final Order, a comprehensive review of a power purchase agreement is consistent with this Commission's directive to utilities that they assist the Commission in its gatekeeper role when reviewing QF contracts.  Order No. 32257 at 9.  We find that it is reasonable and consistent with the authority granted us under PURPA, and that the public interest requires that each party have a full and final review of the contract before signing and obligating the utility and its ratepayers to hundreds of millions of dollars in energy payments over the 20-year life of the agreement.  The Projects were given unrestricted time to adequately review the contracts before signing.  Idaho Power is obligated to be as diligent in its review prior to asking the Commission to commit ratepayer dollars.

   The Projects also argue that their Agreements were effective prior to December 14, 2010, because of the Projects' offer to sell their energy to Idaho Power.  However, this argument has no basis given the very terms of the Agreements themselves.  Each Agreement states that the "effective date" of the Agreement is represented by the date upon which the Agreement <u>was fully executed by both parties</u>.  Agreements ¶ 1.10.  It is not disputed that December 28, 2010, is

the date upon which the Agreements were fully executed by both parties. It is clear and unambiguous that the Agreements became effective and a legally enforceable obligation occurred when both parties signed the Agreements.

We also recognize that the Agreements also provide that the Agreement will not become effective *until the Commission has approved* all of the terms and conditions and declares that all payments made by Idaho Power to each project for purchases of energy will be allowed as prudently incurred expenses for ratemaking purposes. Agreements ¶ 21.1 (emphasis added). An effective date based on Commission approval of the Agreement has been supported on Idaho Supreme Court review.[2] No one has argued that the legally enforceable obligation arises only when the Commission has approved the Agreements. Based upon this record, we find that the legally enforceable obligation is the date that the parties executed the Agreements and agreed to be bound by the terms contained therein. The considerations made by this Commission are authorized by PURPA and FERC regulations. The Projects have failed to demonstrate that we were not regularly pursuing our authority. Consequently, reconsideration of this issue is denied.

### D. Grandfather Tests

The Projects next argue that the Commission's decision to not consider the application of grandfathering criteria is arbitrary and capricious. The Projects claim that they have "satisfied all of the Commission's prior tests for establishing grandfathered rights to previously available avoided cost rates, including a prior test used the other time rates became unavailable because the Commission reduced the eligibility cap for published rates." Reconsideration at 5 *citing In the Matter of Petition of Cassia Wind to Determine Exemption Status*, IPC-E-05-35, Order No. 29954. The Projects contend that they satisfied the requirements of the Commission's grandfathering precedent before the effective date of the eligibility cap reduction.

***Commission Findings***: The Projects' reliance on Order No. 29954 is misplaced. First, the Commission explicitly stated that "we look at the totality of the facts" in assessing entitlement to grandfathering status. Order No. 29954 at 2. In these Agreements, the "effective date" of each Agreement is <u>after</u> the Commission lowered the eligibility cap for the published

---

[2] "Rosebud is not entitled to a lock-in of an avoided cost rate until it has entered into a legally enforceable *and IPUC approved* obligation for the delivery of energy and capacity." *Rosebud Enterprises*, 128 Idaho at 620, 917 P.2d at 777 (emphasis added).

ORDER NO. 32299                    10

avoided cost rate to 100 kW. Thus, the parties' own agreement does not support that use of grandfathering. Second, the Idaho Supreme Court has stated that "[c]onferment of grandfathered status on [a] qualifying facility is essentially an IPUC finding that a legally enforceable obligation to sell power existed by a given date. *Such a finding is within the discretion of the state regulatory agency.*" *Rosebud Enterprises*, 128 Idaho 624, 917 P.2d at 781 (emphasis added). In this consolidated case, we found that each of the two projects incurred a legally enforceable obligation on December 28, 2010. Thus, there is no occasion to resort to the use of grandfathering criteria. Based upon this record, we find that the time Idaho Power took to complete its final review of the Agreements was reasonable. This finding is consistent with our authority under federal and state law.

Third, our Supreme Court has noted, "Because regulatory bodies perform legislative as well as judicial functions in their proceedings, they are not so rigorously bound by the doctrine of *stare decisis* that they must decide all future cases in the same way as they have decided similar cases in the past." *Rosebud Enterprises v. Idaho PUC*, 128 Idaho 609, 618, 917 P.2d 766, 775 (1996) *citing Intermountain Gas Co. v. Idaho PUC*, 97 Idaho 113, 119, 540 P.2d 775, 781 (1975). "So long as the Commission enters sufficient findings to show that its action is not arbitrary and capricious, the Commission can alter its decisions." *Washington Water Power v. Idaho PUC*, 101 Idaho 567, 579, 617 P.2d 1242, 1254 (1980). Therefore, simply because grandfathering criteria have been used in consideration of QF eligibility to published rates in the past does not mean that this Commission must decide all future QF eligibility cases in the same manner.

The criteria considered in Order No. 29954 for determining project eligibility to published avoided cost rates following a change in the eligibility cap are substantially different than the grandfathering criteria that these two projects initially presented and argued as precedent in their comments.[3] Regardless of whether it is a change in the eligibility cap for access to published rates or a change in the rates themselves, the Commission is not bound by prior grandfathering treatment decisions so long as our decision is based on substantial and competent

---

[3] The Projects initially argued that, "[w]hen the published rates change, or become otherwise unavailable to a QF before the QF can obtain a contract, the QF is entitled to grandfathered rates if it can 'demonstrate that 'but for' the actions of [the utility, the QF] was otherwise entitled to a power purchase contract." Comments at 7. The Projects also alleged that they satisfied the "pre-filed complaint" test. These criteria have been utilized by this Commission for *rate changes*, not changes in the eligibility cap.

evidence in the record and we enter sufficient findings to demonstrate that is the case. In contrast to the change in eligibility for published rates in 2005,[4] no criteria were enunciated or established by this Commission to determine project eligibility through the use of grandfathering for QF agreements executed on or after December 14, 2010. Because the Commission's decision to not utilize grandfathering criteria was not arbitrary and/or capricious, we deny reconsideration on this issue. As stated in our final Order, it is adverse to the public interest to allow parties who have not executed contracts to avail themselves of an eligibility cap that is no longer in place. *Id.* at 9. Grandfathering contracts that were executed on or after December 14, 2010, and allowing them to utilize an eligibility cap that is no longer applicable would be contrary to our determination regarding what the public interest requires. This finding is supported by substantial and competent evidence in the record and as explained in our orders.

Moreover, no appeal was taken from the Commission's Order to lower the eligibility cap. *Idaho Code* § 61-625 prohibits collateral attacks of Commission Orders that are final and conclusive. "A different rule would lead to endless consideration of matters previously presented to the Commission and confusion about the effectiveness of Commission orders." *Utah-Idaho Sugar Co. v. Intermountain Gas Co.*, 100 Idaho 368, 373, 597 P.2d 1028, 1063 (1979). The Projects are, in essence, collaterally attacking the Commission's prior Order reducing the eligibility cap by arguing that grandfathering criteria should apply. However, no party timely appealed the Commission's decision in that case. Case No. GNR-E-10-04; Order Nos. 32176 and 32212. Therefore, the Commission's decision to lower the eligibility cap from 10 aMW to 100 kW for wind and solar projects effective December 14, 2010, is a final and conclusive Order of the Commission that is not subject to collateral attack.

### E. Rulemaking and the Idaho Administrative Procedures Act

Finally, the Projects argue that the Commission's bright line rule is in violation of the rulemaking requirements of the Idaho Administrative Procedures Act and is, therefore, void. The Projects contend that because the Commission explicitly stated that it was not implementing a rate change, the APA is applicable to the Commission's non-ratemaking act of establishing a new rule. Reconsideration at 7 *citing A.W. Brown*, 121 Idaho 812, 828 P.2d 841.

---

[4] The Commission outlined criteria that it would consider in determining whether a project was eligible for the previous, no longer applicable, eligibility cap for published avoided cost rates, i.e., whether a project would be "grandfathered" and permitted to utilize the old eligibility cap. Order No. 29839.

*Commission Findings*:  The Projects mischaracterize the nature of the Commission's actions and misconstrue the APA analysis of the Court in *A.W. Brown*.  "The Commission, as part of its statutory duties, determines reasonable rates and investigates *and reviews contracts*." *A.W. Brown Company v. Idaho Power Company*, 121 Idaho 812, 816, 828 P.2d 841, 845 (1992) (emphasis added).  These duties are legislative, not adjudicative, in nature.  The Projects' attempt to void the Commission's findings and its basis for disapproval of the Agreements by arguing a violation of the APA is without merit.  The Commission, as an agency of the legislative branch of government, exercises delegated legislative powers to make rates.  *Id.*  *Idaho Code* § 61-502 defines "Determination of rates" as

> Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that . . . the rules, regulations, practices, or contracts [by any public utility] affecting such rates . . . are unjust, unreasonable, discriminatory or preferential, or in any wise in violation of any provision of law . . . the commission shall determine the just, reasonable or sufficient rates, fares, tolls, rentals, charges, classifications, rules, regulations, practices or contracts to be thereafter observed and in force . . . .

Review of contracts or agreements that contain PURPA rates falls clearly within the Commission's ratesetting, i.e., legislative, function.  "The APA specifically does not apply to 'those in the legislative or judicial branch.'  I.C. § 67-5201."  *A.W. Brown Company v. Idaho Power Company*, 121 Idaho 812, 819, 828 P.2d 841, 848 (1992).  Therefore, reconsideration of this issue is denied.

## CONCLUSION

The Commission has jurisdiction over Idaho Power, an electric utility, and the issues raised in this matter pursuant to the authority and power granted it under Title 61 of the Idaho Code and the Public Utility Regulatory Policies Act of 1978 (PURPA).  The Commission has authority under PURPA and the implementing regulations of the Federal Energy Regulatory Commission (FERC) to set avoided cost rates, to order electric utilities to enter into fixed-term obligations for the purchase of energy from qualified facilities (QFs) and to implement FERC rules.  *Rosebud Enterprises, Inc. v. Idaho Public Utilities Commission*, 128 Idaho 609, 612, 917 P.2d 766, 769 (1996).

Although FERC promulgated the general scheme and rules, it left the actual implementation of PURPA to the state regulatory authorities.  *Id.*, 128 Idaho at 614, 917 P.2d 771.  FERC rules insist that rates for purchases from QFs be just and reasonable to ratepayers, in

the public interest, and not discriminatory against QFs.  18 C.F.R. § 292.304(a)(1).  Notably, PURPA and the implementing regulations require only that published/standard avoided cost rates be established and made available to QFs with a design capacity of 100 kW or less.  18 C.F.R. § 292.304(c).  When this Commission reduced wind and solar projects' eligibility to published avoided cost rates we unequivocally stated that continuing to allow large wind and solar projects access to published avoided cost rates for projects greater than 100 kW was "clearly not in the public interest."  Order No. 32262.  We reaffirmed that determination in the present case by finding that "it is not in the public interest to allow parties with contracts executed on or after December 14, 2010, to avail themselves of an eligibility cap that is no longer applicable."  Order No. 32257 at 10.  The Projects have failed to demonstrate that the Commission's findings are unreasonable, unlawful, erroneous, or not in conformity with the law.  Rule of Procedure 331, IDAPA 31.01.01.331.01.

The Firm Energy Sales Agreements between Idaho Power and the two projects were executed on December 28, 2010.  The Agreements recite that each project will have a maximum capacity amount of 21 MW.  Under normal and/or average conditions, each project will not exceed 10 aMW on a monthly basis.  Because the size of each of these wind projects exceeds 100 kW, they are not eligible to receive the published avoided cost rate.  Nevertheless, the Projects are entitled to PURPA contracts with avoided cost rates calculated using the IRP Methodology.

O R D E R

IT IS HEREBY ORDERED that the Joint Petition for Reconsideration filed by Grouse Creek Wind Park and Grouse Creek Wind Park II is denied.

THIS IS A FINAL ORDER ON RECONSIDERATION.  Any party aggrieved by this Order or other final or interlocutory Orders previously issued in this Case Nos. IPC-E-10-61 or 10-62 may appeal to the Supreme Court of Idaho pursuant to the Public Utilities Law and the Idaho Appellate Rules.  See *Idaho Code* § 61-627.

DONE by Order of the Idaho Public Utilities Commission at Boise, Idaho this 27ʳᵗʰ day of July 2011.

PAUL KJELLANDER, PRESIDENT

MACK A. REDFORD, COMMISSIONER

MARSHA H. SMITH, COMMISSIONER

ATTEST:

Jean D. Jewell
Commission Secretary

O:IPC-E-10-61_IPC-E-10-62_ks5

ORDER NO.  32299                    15

**PUC EXHIBIT 3**

**ORDER NO. 32635**

Office of the Secretary

Service Date

September 7, 2012

## BEFORE THE IDAHO PUBLIC UTILITIES COMMISSION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF IDAHO POWER COMPANY FOR A DETERMINATION REGARDING THE FIRM ENERGY SALES AGREEMENT FOR THE SALE AND PURCHASE OF ELECTRIC ENERGY BETWEEN IDAHO POWER COMPANY AND GROUSE CREEK WIND PARK, LLC (10-61) AND GROUSE CREEK WIND PARK II, LLC (10-62). | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

| | |
|---|---|
| GROUSE CREEK WIND PARK, LLC and GROUSE CREEK WIND PARK II, LLC, | )<br>)<br>) |
| Petitioners/Appellants, | )<br>) |
| v. | )<br>) |
| IDAHO PUBLIC UTILITIES COMMISSION, | )<br>) |
| Respondent, Respondent on Appeal, | )<br>) |
| and | )<br>) |
| IDAHO POWER COMPANY, | )<br>) |
| Respondent-Intervenor/Respondent on Appeal. | )<br>) |

SUPREME COURT
DOCKET NO. 39151-2011

IPUC CASE NOS. IPC-E-10-61
IPC-E-10-62

ORDER NO. 32635

On July 27, 2011, the Commission issued Final Order on Reconsideration No. 32299 affirming its initial decision to not approve two Power Purchase Agreements ("PPAs" or "Agreements") entered into between the Grouse Creek Wind Park projects (collectively referred to as "Grouse Creek") and Idaho Power Company pursuant to the federal Public Utility Regulatory Policies Act of 1978 (PURPA). Based upon the express terms of the Agreements, the Commission found that the PPAs were not effective prior to December 14, 2010 – the date on which the eligibility for PURPA published avoided cost rates in Idaho changed from 10 average megawatts (aMW) to 100 kilowatts (kW) for wind and solar qualifying facilities (QFs). Final Order No. 32257. Because each of the PPAs requested published avoided cost rates but the projects were in excess of 100 kW, the Commission found that the published rates were not available to the wind projects.

ORDER NO. 32635                    1

On September 7, 2011, Grouse Creek appealed the Commission's Orders to the Idaho Supreme Court. On October 4, 2011, the Federal Energy Regulatory Commission (FERC) issued a Declaratory Order in what appeared to be a similarly situated case ("the Cedar Creek Case") stating that the Idaho Commission's decision not to approve Cedar Creek's PPAs was inconsistent with PURPA and FERC's regulations. *Notice of Intent Not to Act and Declaratory Order*, 137 FERC ¶ 61,006 (Oct. 4, 2011). On November 3, 2011, in response to FERC's Declaratory Order, Grouse Creek, this Commission and Idaho Power filed a Stipulated Motion with the Idaho Supreme Court to suspend the appeal and remand the matter to the PUC. The Court granted the Motion on November 22, 2011.

Grouse Creek, Idaho Power and Commission Staff met to discuss settlement of the issues on December 9, 2011, and December 22, 2011. Settlement discussions were unfruitful. The Commission directed the parties to file legal briefs and oral argument was held on March 7, 2012. After reviewing the underlying record, arguments of the parties and controlling statutory and case law, we decline to approve the two Power Purchase Agreements between Grouse Creek and Idaho Power based on the avoided cost rates contained in the Agreements, and as more fully described herein.

## BACKGROUND

### A. The Power Purchase Agreements (PPAs)

On December 28, 2010, Idaho Power and the two Grouse Creek wind projects entered into their respective PPAs. Under the terms of the PPAs, each wind project agrees to sell electric energy to Idaho Power for a 20-year term using 10 aMW non-levelized published avoided cost rates. Applications at 4. The nameplate rating of each project is 21 MW. Under normal and/or average conditions, each wind QF will not sell more than 10 aMW on a monthly basis to Idaho Power. The projects are located near Lynn, Utah.

Each project selected June 1, 2013, as the "Scheduled First Energy Date" and December 1, 2013, as the "Scheduled Operation Date." Applications at 5. Idaho Power asserted that it advised each project of the project's responsibility to work with Idaho Power's delivery business unit to ensure that sufficient time and resources would be available for the delivery unit to construct the necessary interconnection facilities, and transmission upgrades if required, in time to allow the projects to achieve their December 1, 2013, Scheduled Operation Date. The Applications state that the projects have been advised that delays in the interconnection or

transmission process do not constitute excusable delays and if a project fails to achieve its Scheduled Operation Date, delay damages will be assessed. *Id.* at 6. The Applications further maintain that Grouse Creek has acknowledged and accepted the risks inherent in proceeding with its PPAs without knowledge of the actual requirements for interconnection facilities and possible transmission upgrades. *Id.* at 7. In each PPA, the parties have agreed to liquidated damage and security provisions of $45 per kW of nameplate capacity. Agreements ¶¶ 5.3.2, 5.8.1. Idaho Power also maintained that each project was aware of and accepted the provisions in the Agreements and Idaho Power's approved Schedule 72 regarding non-compensated curtailment or disconnection of the project should certain operating conditions develop on Idaho Power's system.

By its own terms, the "Effective Date" for each PPA is "[t]he date stated in the opening paragraph of this Firm Energy Sales Agreement representing the date upon which this Firm Energy Sales Agreement was fully executed by both Parties." Agreements ¶ 1.11. The opening paragraph of each Agreement reflects that they were "entered into" on December 28, 2010. *Id.* at p. 1. Each Agreement further states that it will not become effective until the Commission has approved all of the terms and conditions and declares that all payments made by Idaho Power to Grouse Creek for purchases of energy will be allowed as prudently incurred expenses for ratemaking purposes. Agreements ¶ 21.1.

### B. Order No. 32257

On June 8, 2011, the Commission issued final Order No. 32257 disapproving the two Agreements between Idaho Power and each of the wind projects – Grouse Creek Wind Park and Grouse Creek Wind Park II.[1] The Commission determined that the Agreements were not fully executed (signed by both parties) prior to December 14, 2010, the date upon which the eligibility for published avoided cost rates changed from 10 aMW to 100 kW for wind and solar projects. Order No. 32176. Consequently, the Commission found that the rates contained in the Agreements were no longer available because each of the projects requested published avoided cost rates and each QF was larger than 100 kW. Order No. 32257 at 10.

The Commission found that Grouse Creek signed each Agreement on December 20, 2010, and Idaho Power signed on December 28, 2010. *Id.* at 9. The Commission also noted that

---

[1] The two projects had previously filed consolidated comments maintaining that the "relevant facts for each of these two projects are substantially similar." Project Comments at n.1. Consequently, the Commission found it reasonable and appropriate to consolidate the cases and issue a consolidated final Order. Order No. 32257 at n.1.

the Agreements contain language regarding the effective date. The terms of the Agreements unequivocally state that the "Effective Date" of the Agreements is "The date stated in the opening paragraph of this . . . Agreement representing the date upon which this [Agreement] was fully executed by both Parties." Agreements ¶ 1.10. The opening paragraph is dated "this 28 day of December, 2010."

The Commission stated that "[t]he Commission does not consider a utility and its ratepayers obligated until both parties have completed their final reviews and signed the agreement." Order No. 32257 at 9. The Commission observed that "a thorough review is appropriate and necessary prior to signing Agreements that obligate ratepayers to payments in excess of $230 million" over the 20-year term of the Agreements. *Id.* The Commission established a bright line rule that for a wind or solar QF larger than 100 kW to be eligible for published avoided cost rates, the Power Purchase Agreement must have been executed, i.e., signed by both parties, prior to the December 14, 2010, effective date of the change in eligibility criteria. *Id.* at 10. The Commission concluded that it was "not in the public interest to allow parties with contracts executed on or after December 14, 2010, to avail themselves of an eligibility cap that is no longer applicable." *Id.*

## C. Reconsideration of Order No. 32257

On June 29, 2011, Grouse Creek filed a timely Petition for Reconsideration of the Commission's final Order No. 32257. Grouse Creek argued that, pursuant to 18 C.F.R. § 292.304(d)(2)(ii), a QF is entitled to the rates that are in effect on the date the QF incurred a legally enforceable obligation to provide energy. The projects maintained that the "obligation to purchase a QF's output is created by the QF committing itself to sell to an electric utility, which also commits the electric utility to buy from the QF." Reconsideration Petition at 5. Based on this premise, Grouse Creek argued that the Commission's final Order was arbitrary and capricious and not in conformity with controlling federal law because it requires a utility's signature to establish a legally enforceable obligation.

On July 6, 2011, Idaho Power filed an Answer to the Petition for Reconsideration. Idaho Power maintained that the Commission's final Order is based on substantial and competent evidence. The utility asserted that it was "not in the public interest to allow parties with contracts executed on or after December 14, 2010, to avail themselves of [a published rate] that is no longer applicable." Answer at 6 *quoting* Order No. 32257 at 9. Idaho Power asserted

that the Commission was acting within its discretion and, therefore, reconsideration should be denied. *Id.* at 8-9.

On July 27, 2011, the Commission issued Order No. 32299 denying the projects' Petition for Reconsideration. The Order stated that the parties entered into a legally enforceable obligation at the time that both parties executed the Power Purchase Agreements. By their very terms, the Agreements were not effective until December 28, 2010. Agreements ¶ 1.11. On that date, wind projects larger than 100 kW were no longer entitled to the 10 aMW published avoided cost rate. This Commission explained that "FERC regulations grant the states latitude in implementing the regulation of sales and purchases between QFs and electric utilities." Order 32299 at 7 *citing Federal Energy Regulatory Commission v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). In determining when the parties incurred a legally enforceable obligation, the Commission properly exercised the authority granted us by FERC. *Id.*

The Commission further explained that nothing cited by Grouse Creek demonstrated that the Commission's Order is arbitrary, capricious or inconsistent with federal law. The Commission noted that FERC specifically delegated authority to the state commissions to determine when and how a legally enforceable obligation is created. The Commission also determined that its decision is in the public interest and strikes a balance between "the local public interest of a utility's electric consumers and the national public interest in development of alternative energy sources." *Rosebud Enterprises v. Idaho PUC*, 128 Idaho 609, 613, 917 P.2d 766, 770 (1996).

### D. Appeal and Remand

On September 7, 2011, Grouse Creek appealed the Commission's Orders to the Idaho Supreme Court. On October 4, 2011, while the appeal was pending, FERC issued a Declaratory Order in the Cedar Creek case that the PUC's decision not to approve Cedar Creek's PPAs was inconsistent with PURPA and FERC's regulations implementing PURPA. *Notice of Intent Not to Act and Declaratory Order*, 137 FERC ¶ 61,006 (Oct. 4, 2011). FERC construed this Commission's final Order in the Cedar Creek case as "limiting the creation of a legally enforceable obligation only to QFs that have [PPAs] . . . signed by both parties to the agreement." *Id.* at ¶ 26. FERC interpreted our Order as requiring a fully-executed contract as a condition precedent to the creation of a legally enforceable obligation between the parties. *Id.* at ¶¶ 30, 35. FERC concluded that our Cedar Creek Orders did not recognize that "a legally

enforceable obligation may be incurred before the formal memorialization of a contract to writing." *Id.* at ¶ 36.

On November 3, 2011, in response to FERC's Order, Grouse Creek, this Commission and Idaho Power filed a Stipulated Motion to suspend the Idaho Supreme Court appeal and remand the matter to the Commission for further consideration. The Motion stated that there "is good cause for the Court to grant this Motion in order for the Parties to consider a recent decision issued by the Federal Energy Regulatory Commission ("FERC") regarding the subject matter of the appeal." Motion at 2. Moreover, *Idaho Code* § 61-624 provides that the Commission "may at any time, upon notice to the public utility affected, and after opportunity to be heard . . ., rescind, alter or amend any order or decision made by it." The Court granted the Stipulated Motion on November 22, 2011.

On remand, the Commission invited the parties to participate in settlement negotiations. *See* IPUC Rule 353, IDAPA 31.01.01.353; Order No. 32430. Grouse Creek, Idaho Power and Commission Staff met to discuss settlement of the issues on December 9 and December 22, 2011. Settlement negotiations were ultimately unsuccessful. Consequently, the Commission directed the parties to file legal briefs and scheduled an oral argument for March 7, 2012. Order No. 32430. The parties' arguments on remand are set out below.

### 1. The Grouse Creek Projects

Grouse Creek maintains that it attempted to secure PPAs with Idaho Power for several months prior to December 14, 2010. Initially, in April 2010, the developer requested a PURPA contract for a 65 MW project. Grouse Creek Brief at 9. In June 2010, Grouse Creek indicated that, due to federal permitting issues, it intended to reduce the overall footprint of the project and wanted to discuss two 10 aMW projects, instead of the larger 65 MW project. *Id.* at 6, 9-10.

Grouse Creek maintains that, on July 14, 2010, it submitted a formal request to Idaho Power for two 10 aMW PURPA contracts. *Id.* at 9-10. The projects reiterated their request for two PURPA contracts on August 17, 2010. *Id.* at 11. Grouse Creek asserts that, on October 1, 2010, it sent a letter to Idaho Power "for each Grouse Creek QF, expressing [the projects] intent to obligate the QFs to two power sales agreements for the two QF projects." *Id.* Grouse Creek insists that the letters "listed several standard terms applicable through Commission orders," including the load shape price adjustments, wind integration charge, mechanical availability

guarantee, and wind forecasting and cost sharing provisions. *Id.* However, the projects were disputing the legality of a $45/kW delay liquidated damages provision. *Id.* at 12. On or about November 1, 2010, Idaho Power provided draft PPAs for the projects. The utility insisted on the inclusion of the standard $45/kW delay security deposit. *Id.*

Grouse Creek observed that on November 5, 2010, Idaho Power, Rocky Mountain Power and Avista filed a Joint Motion to Reduce the Published Rate Eligibility Cap. *See generally* Case No. GNR-E-10-04. In response, on November 8, 2010, the Grouse Creek projects each filed a complaint against Idaho Power for failing to negotiate in good faith. In these complaints, Grouse Creek alleged that Idaho Power had acted in bad faith by requiring completion of unnecessary interconnection processes and transmission requests and by refusing to enter into an agreement without a $45/kW delay liquidated damages security provision. *Id.* at 13. Grouse Creek and Idaho Power subsequently settled the disputes asserted in the complaints and entered into the two PPAs whose terms are at issue in this case.

Following successful negotiations, on December 9, 2010, Grouse Creek "requested through e-mail" that the "First Energy Date" and the "Commercial Online Date" in the PPA for both projects be amended and deferred until June 2013 and December 2013, respectively. *Id.* at 14-15. On December 15, 2010, Idaho Power consented to the deferrals in the First Energy and Online Date. *Id.* at 15. Idaho Power forwarded the final PPAs to Grouse Creek for signatures on December 16, 2010. *Id.* at 15-16.

Grouse Creek argues that all material terms were well settled prior to December 14, 2010, despite the projects' inability to obtain fully executed contracts until December 28, 2010. *Id.* at 16. It is on this basis that Grouse Creek asserts a legally enforceable obligation was formed that entitles the projects to the published avoided cost rates contained in Order No. 31025, and as reflected in their PPAs.

## 2. Commission Staff

Staff maintains that the Commission's prior Orders relied only on the express terms of the Agreements between the projects and Idaho Power. Staff acknowledges the PURPA provisions for legally enforceable obligations. However, Staff argues that "the simple act of a QF requesting a PURPA contract from a utility cannot reasonably be interpreted as a commitment by the QF to sell electricity to the utility from which it requests a draft contract.

Something in furtherance of the QFs intent and ability to provide electricity is required." Staff Brief at 5.

In considering whether and when a legally enforceable obligation was incurred, Commission Staff relied on the language in PURPA and the guidance of FERC in the Cedar Creek case. *See Notice of Intent Not to Act and Declaratory Order*, 137 FERC ¶ 61,006 (Oct. 4, 2011). Staff asserts that a legally enforceable obligation was incurred no later than December 9, 2010 – the date upon which the projects modified their on-line dates. Staff Brief at 5. "At that time, QF projects with a design capacity of 10 aMW and smaller were entitled to Idaho's published avoided cost rates. Consequently, Grouse Creek Wind Park and Grouse Creek Wind Park II are entitled to published avoided cost PURPA contracts at published rates that were in effect on December 9, 2010." *Id.* at 6.

### 3. Idaho Power Company

Idaho Power maintains that it pursued good faith negotiations with Grouse Creek and that any delay was not attributable to a refusal by Idaho Power to negotiate or execute a contract. Idaho Power argues that any delay was the result of Grouse Creek's conduct. Idaho Power states that Grouse Creek changed the configuration of the project numerous times, did not agree to standard contract terms and conditions until December 9, 2010, did not provide final and complete information regarding the projects' configuration until December 15, 2010, and did not commit itself to sell its output to Idaho Power until December 21, 2010. Idaho Power Brief at 11.

Idaho Power asserts that it forwarded updated draft PPAs to the projects on December 7, 2010, and notified Grouse Creek of missing information that was necessary for the Company to confirm the required one-mile separation between projects. On December 9, Grouse Creek agreed to the security provisions and requested a change in the Scheduled First Energy Date and Scheduled Operation Date for each Agreement. On December 14, 2010, Idaho Power maintains that it sent communications to Grouse Creek requesting that the projects provide missing necessary information to complete the draft PPAs.[2] Grouse Creek confirmed the operation dates and the legal descriptions on December 15, 2010. *Id.* at 11-12.

---

[2] Idaho Power maintains that the projects failed to name the transmission entity – the projects had indicated at different times that it would either be BPA or PacifiCorp. In addition, Idaho Power states that the projects failed to provide a complete location designation which is necessary to establish both compliance with the one-mile separation rule and provide a proper legal description of the projects' locations.

ORDER NO. 32635          8

Idaho Power states that it provided Grouse Creek with executable copies of two PPAs on December 15, 2010.  Grouse Creek signed the Agreements on December 21, 2010, and returned the PPAs to Idaho Power via overnight mail.  Idaho Power reviewed the Agreements and signed on December 28, 2010.  *Id.*  The Agreements were filed with the Commission on December 29, 2010.  Idaho Power argues that the facts of this case are distinguishable from the Cedar Creek case.  Because Idaho Power did not refuse to enter into a contract with Grouse Creek, the projects' legally enforceable obligation is incurred on the date that they signed the PPAs and obligated themselves to sell output to Idaho Power – on December 21, 2010.  Based on these facts, Idaho Power concludes that Grouse Creek is not eligible for published rate contracts.  Therefore, Idaho Power maintains that the Commission's decision not to approve the contracts should be affirmed.

## FINDINGS AND CONCLUSIONS

The Idaho Public Utilities Commission has jurisdiction over Idaho Power, an electric utility, and the issues raised in this matter pursuant to the authority and power granted it under Title 61 of the Idaho Code and PURPA.  The Commission has authority under PURPA and the implementing regulations of the Federal Energy Regulatory Commission (FERC) to set avoided costs, to order electric utilities to enter into fixed-term obligations for the purchase of energy from qualified facilities (QFs) and to implement FERC rules.

This Commission has been granted authority to implement PURPA and is the appropriate state forum to review contracts and resolve disputes between QFs and electric utilities.  *Idaho Code* §§ 61-502, 61-503*; A.W. Brown v. Idaho Power Co.,* 121 Idaho 812, 816, 828 P.2d 841, 845 (1992); *Empire Lumber Co. v. Washington Water Power Co.,* 114 Idaho 191, 755 P.2d 1229 (1987).  Moreover, the Commission has the authority to engage in case-by-case analysis in setting out its standards and requirements for implementation of PURPA.  *Power Resources Group v. PUC of Texas,* 422 F.3d 231, 237 (5th Cir. 2005) *citing* Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of [PURPA], 23 FERC ¶ 61,304, 1983 WL 39627 (May 31, 1983); *Rosebud Enterprises v. Idaho PUC,* 128 Idaho 609, 917 P.2d 766 (1996).  It is up to the States, not FERC,

> to determine the specific parameters of individual QF power purchase agreements, including the date at which a legally enforceable obligation is incurred under State law.  Similarly, whether the particular facts applicable to an individual QF necessitate modifications of other terms and conditions of

the QF's contract with the purchasing utility is a matter for the States to determine.

*West Penn Power Co.*, 71 FERC ¶ 61,153 at 61,495 (1995). *Accord: Jersey Central Power & Light Co.*, 73 FERC ¶ 61,092 at 61,297-61,298 (1995); *Metropolitan Edison Co.*, 72 FERC ¶ 61,015 at 61,050 (1995). FERC is not a forum for adjudicating the specific provisions of each individual QF contract. *Id.* The exercise of a State commission's discretion in the application of PURPA standards to particular contracts has long been recognized as outside the scope of FERC's enforcement authority.[3]

This case was remanded to the Commission from the Idaho Supreme Court based on the Stipulated Motion to Suspend the Appeal. The remand was intended to allow the Commission to consider the implication of FERC's Cedar Creek Declaratory Order on the specific facts of this case. Grouse Creek relies upon FERC's determination that this Commission's final Order – in the Cedar Creek case – limits "the creation of a legally enforceable obligation only to QFs that have [PPAs] . . . signed by both parties to the agreement." *Notice of Intent Not to Act and Declaratory Order*, 137 FERC ¶ 61,006 at ¶ 26 (Oct. 4, 2011). Based on this premise, FERC stated that the Commission's decision to not approve the Cedar Creek PPAs was inconsistent with PURPA and FERC's regulations implementing PURPA. *Id.* Grouse Creek extrapolates from FERC's Declaratory Order that the Commission's decision to not approve its two PPAs is likewise inconsistent with PURPA and FERC's regulations implementing PURPA.

At the outset, we note that this Commission did not and has never made a determination that the creation of a legally enforceable obligation <u>only</u> occurs when a QF and a utility enter into a written and signed agreement. In our prior Orders in this case, we found that Grouse Creek and Idaho Power entered into Agreements with one another that specifically stated the terms and conditions of the Agreements – including the effective date. We recognized and chose to enforce the terms of the Agreements that the parties entered into voluntarily. We specifically noted that "each Firm Energy Sales Agreement states that the 'Effective Date' of the Agreement is 'The date stated in the opening paragraph of this . . . Agreement representing the

---

[3] *Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978*, 23 FERC ¶ 61,304 at 61,645 (1983) (". . . the Commission's role is limited regarding questions of the proper application of these rules on a case-by-case basis"). *See Power Resource Group, Inc. v. Pub. Utils. Comm'n of Texas*, 422 F.3d 231, 238 (5th Cir. 2005); *Mass. Inst. Tech. v. Mass. Dept. of Pub. Utils.*, 941 F.Supp. 233, 236-237 (D. Mass. 1996).

ORDER NO. 32635              10

date upon which this [Agreement] was fully executed by both Parties.' Agreements ¶ 1.11. The opening paragraph is dated 'this 28 day of December, 2010.' Agreements at 1." Order No. 32257 at 9; Agreements ¶ 5.1. We find that the Agreements were negotiated, agreed to and executed by both parties and clearly and unambiguously state that the effective date of the PPAs is December 28, 2010.

As we previously explained, "FERC regulations grant the states latitude in implementing the regulation of sales and purchases between QFs and electric utilities." *FERC v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). According to FERC, "it is up to the States, not [FERC] to determine the specific parameters of individual QF power purchase agreements." *Rosebud Enterprises v. Idaho PUC*, 128 Idaho 609, 623, 5624, 917 P.2d 766, 781, 782 (1996) *citing West Penn Power Co.*, 71 FERC ¶ 61,153 (1995). This Commission determined that, by the clear and unambiguous terms of the Agreements themselves, the Agreements were not effective until December 28, 2010. Order No. 32299 at 7. Because the size of each Grouse Creek project exceeds 100 kW and each Agreement became effective after December 14, 2010, we found that the terms within the Agreements, i.e., published avoided cost rates, did not comply with Order No. 32176. Order No. 32257 at 9-10; Order No. 32299 at 7, 8-10. Our findings in this respect are supported by substantial and competent evidence – the request by Idaho Power and Grouse Creek to approve its PPAs and the unambiguous terms of the Agreements. We clearly did not make a finding that the creation of a legally enforceable obligation <u>only</u> occurs when a QF and a utility enter into a written and signed agreement. We found, based on the specific facts of the two Grouse Creek projects that the parties entered into Agreements that unequivocally state an effective date. We are simply recognizing the express terms of the executed Agreements. This finding is entirely consistent with Idaho law and the authority granted to us by PURPA and FERC.

It is also important to note that a declaratory order issued by FERC is not legally binding on this Commission. A declaratory order "that does no more than announce the [FERC's] interpretation of the PURPA or one of the agency's implementing regulations is of no legal moment unless and until a district court adopts that interpretation when called upon to enforce the PURPA." *Niagara Mohawk Power Corp., v. FERC*, 117 F.3d 1485, 1488, 326 U.S.App.D.C. 135, 138 (1997).

> Unlike the declaratory order of a court, which does fix the rights of the parties, this [FERC] Declaratory Order merely advised the parties of the [FERC's] position. It was much like a memorandum of law prepared by the FERC staff in anticipation of a possible enforcement action; the only difference is that the [FERC] itself formally used the document as its own statement of position. While such knowledge of the FERC's position might affect the conduct of the parties, the Declaratory Order is legally ineffectual apart from its ability to persuade (or to command the deference of) a [district] court that might later have been called upon to interpret the Act and the agency's regulations in an [sic] private enforcement action. . . ."

*Industrial Cogenerators v. FERC*, 47 F.3d 1231, 1235 (D.C. Cir. 1995).

In the matter before us, Grouse Creek relies on a FERC Declaratory Order, issued as the result of an enforcement petition filed with FERC by an entirely separate QF project – Cedar Creek. After the Declaratory Order was issued, the parties to the Cedar Creek case returned to this Commission with terms of a stipulated settlement and requested its approval. Based on the specific facts of the Cedar Creek case and the settlement proposal, we approved the settlement. Order No. 32419. The Grouse Creek projects are distinct in many ways. Grouse Creek has not petitioned FERC for an enforcement order, Grouse Creek has been unable to negotiate a settlement agreeable to all parties, and Grouse Creek is relying on a FERC Declaratory Order that is not binding on this Commission. In addition, Grouse Creek did not sign its PPAs until December 20, 2010 – after the change in eligibility on December 14. Agreements at p. 33. Furthermore, the language of FERC's Declaratory Order leads us to doubt whether FERC understood the basis upon which this Commission made its initial decision to disapprove the Agreements.

The Idaho Commission has aggressively and proactively enforced PURPA, as evidenced by the abundance of QF projects that now operate in our State. We have a long history of recognizing two methods by which a QF can obtain an avoided cost rate in Idaho: (1) by entering into a signed contract with the utility; or (2) by filing a meritorious complaint alleging that "a legally enforceable obligation" has arisen and, but for the conduct of the utility, there would be a contract. *Rosebud Enterprises v. Idaho PUC*, 131 Idaho 1, 951 P.2d 521 (1997); *see also A.W. Brown v. Idaho Power Company*, 121 Idaho 812, 816, 828 P.2d 841, 845 (1992). Our application of this framework conforms with FERC's analysis of its standards. In *JD Wind 1*, FERC succinctly stated,

> Thus, under our regulations, a QF has the option to commit itself to sell all or part of its electric output to an electric utility. *While this may be done through a contract, if the electric utility refuses to sign a contract,* the QF may seek state regulatory authority assistance to enforce the PURPA-imposed obligation on the electric utility to purchase from the QF, and *a non-contractual, but still legally enforceable, obligation will be created pursuant to the state's implementation of PURPA.* Accordingly, a QF, by committing itself to sell to an electric utility, also commits the electric utility to buy from the QF; *these commitments result either in contracts or in non-contractual, but binding, legally enforceable obligations.*

*JD Wind 1*, 129 FERC ¶ 61,148 at 61,633 (Nov. 19, 2009) (emphases added). FERC determined that, regardless of whether the energy offered was firm or non-firm power, the QF was entitled to a legally enforceable obligation because the utility in *JD Wind* was refusing to enter into a contract with the QF. FERC reiterated its conclusions on reconsideration. *JD Wind 1*, 130 FERC ¶ 61,127 at 61,628. The matter before this Commission involves two parties who voluntarily entered into PPAs with negotiated terms and conditions.

Idaho's framework for determining whether and when a QF can obtain an avoided cost rate is entirely consistent with the federal standards as set out by FERC. Either the parties enter into a contract or, if the utility is failing to negotiate or refusing to enter into a contract with a QF, the QF can file a complaint with this Commission, at which time the Commission will make a determination as to whether and when a legally enforceable obligation arose. In this case, the parties negotiated and executed two Agreements. On December 29, 2010, the parties submitted their PPAs to the Commission for approval. A determination regarding whether and when a legally enforceable obligation arose – outside the specific contract terms – was wholly unnecessary. The Agreements submitted to the Commission for approval included all of the terms and conditions negotiated and agreed to by the parties – including the effective date of the Agreements.

It would be unreasonable and arbitrary for us to supplant the agreed upon terms of a negotiated and signed contract with additional terms and/or conditions without a compelling reason. Moreover, Grouse Creek urged the Commission to approve the Agreements as submitted. When a contract has been entered into by the parties and submitted for approval, there is no need for a determination regarding any other legally enforceable obligation. FERC refers to a legally enforceable obligation in the disjunctive – either a contract is entered into OR a legally enforceable obligation is created. With regard to the subject PPAs between Idaho

Power and Grouse Creek, the legally enforceable obligations of the parties are contained within the four corners of the Agreements.

More importantly, Section 29.1 of each Agreement states that "[t]his Agreement constitutes the entire Agreement of the Parties concerning the subject matter hereof and supersedes all prior or contemporaneous oral or written agreements between the Parties concerning the subject matter hereof." Agreements ¶ 29.1 (emphasis added). This integration clause[4] is consistent with the general rule that "when a contract has been reduced to writing, which the parties intend to be a complete statement of their agreement, any other written or oral agreements or understandings . . . made prior to or contemporaneously with the written 'contract' and which relate to the same subject matter are not admissible to vary, contradict or enlarge the terms of the written contract." *Chapman v. Haney Seed Co., Inc.*, 102 Idaho 26, 28, 624 P.2d 408, 410 (1981). Thus, Grouse Creek accepted that, by entering into the PPAs, all prior agreements would be replaced by the terms of the written and signed PPAs – including any agreement or understanding as to a prior legally enforceable obligation. Section 29.1 functions as an acknowledgement by the parties that the terms of the written Agreements supersede all prior oral or written agreements between the parties. *Thomas v. Thomas*, 150 Idaho 636, 644-645, 249 P.3d 829, 837-838 (2011); *Silver Syndicate v. Sunshine Mining Co.*, 101 Idaho 226, 235, 611 P.2d 1011, 1020 (1979).

Grouse Creek's arguments on remand rely on the FERC Declaratory Order as support that Grouse Creek perfected a legally enforceable obligation "no later than November 8, 2010" (the date that Grouse Creek filed complaints against Idaho Power) or alternatively, it established a legally enforceable obligation "at the very latest on December 9, 2010." Brief at 3. In either case, Grouse Creek asserts that it formed a legally enforceable obligation prior to December 14, 2010 – the date that the eligibility cap for published avoided cost rates decreased to 100 kW. *Id.* at 2. Even assuming, *arguendo*, that a legally enforceable obligation could somehow preempt the terms of subsequently written and signed Agreements between the parties, we find that a legally enforceable obligation did not exist prior to December 14, 2010.

Turning first to the November 8 date, we find this claim unsupported by the evidence for two reasons. First, we acknowledge that Grouse Creek filed a complaint on November 8,

---

[4] In *Primary Health Network v. Idaho Dept. of Administration*, the integration clause stated that "the Agreement supersedes all prior and contemporaneous arrangements, understandings, negotiations and discussion." 137 Idaho 663, 668 n.2, 52 P.3d 307 312 n.2 (2002).

ORDER NO. 32635                        14

2010 – just three days after the Joint Motion to Reduce the Published Rate Eligibility Cap was filed by the utilities. However, Grouse Creek subsequently requested that the Commission not serve a summons on Idaho Power because the parties were negotiating and had tentatively reached a settlement. Indeed, a summons was never issued and the parties filed two PPAs for approval with this Commission six weeks later. The complaint process did not need to be initiated because the parties were actively negotiating terms of their Agreements. Grouse Creek also urged the Commission in its written comments in the PPA cases to approve the PPAs – it did not pursue the complaints. Comments at 24. Second, the parties subsequently negotiated and executed PPAs that specifically included language about the written Agreements superseding all prior agreements. *See supra* pp. 13-14. Based on these facts, we cannot find that a legally enforceable obligation arose on or by November 8, 2010.

The utility did not refuse to sign a contract. In fact, ongoing negotiations led to the parties' voluntarily entering into two subsequent PPAs. Grouse Creek never initiated a complaint process because Agreements were negotiated and Grouse Creek urged the Commission to approve the terms of the Agreements. We find that no conduct by the utility unnecessarily delayed or impeded Grouse Creek's ability to enter into its Agreements. Because the utility did not impede Grouse Creek's ability to enter into PPAs, a determination regarding a legally enforceable obligation was never triggered. This Commission did not substitute a "fully executed contract" standard in place of a "legally enforceable obligation," nor did we require a fully executed contract as a condition precedent to the creation of a legally enforceable obligation. We simply acknowledged the distinction between the concepts and looked to the terms of the unambiguous Agreements signed by both parties and submitted to the Commission for approval. Grouse Creek cannot now argue against terms that are included in its contracts simply because those terms do not provide it with a favorable outcome.

We also find that the evidence and the conduct of the parties do not support that a legally enforceable obligation was formed no later than December 9, 2010. First, on December 9, 2010, Grouse Creek requested that the PPAs be amended to delay the two operational dates by six months. Brief at 14-15. In addition, Idaho Power notes that it requested information on both December 7 and December 14, 2010, and notified Grouse Creek that the projects failed to provide a complete location designation which is necessary to establish both compliance with the one-mile separation rule and provide a proper legal description of the projects' locations. Idaho

Power also maintains that the projects failed to name the transmission entity – Grouse Creek had indicated at different times that it would either be BPA or PacifiCorp. Grouse Creek confirmed the operation dates and the legal descriptions on December 15, 2010 – a day after the eligibility cap was reduced. *Id.* at 11-12. Idaho Power formally agreed to the delay on December 16, 2010. *Id.* at 15.

After receiving the final material terms, Idaho Power forwarded executable PPAs to Grouse Creek for signature on December 16, 2010. Brief at 15-16. Grouse Creek reviewed the documents and signed the PPAs four days later – on December 20, 2010.[5] Idaho Power reviewed the documents and signed on December 28, 2010. Consequently, we find that negotiations were on-going and that material terms to the Agreements were still in flux on and after December 14, 2010 – the date upon which eligibility to published avoided cost rates became effective. Therefore, assuming that a determination regarding when a legally enforceable obligation arose is necessary, we find that a legally enforceable obligation did not arise prior to December 14, 2010, because material terms to the Agreements were still incomplete on that date.

Finally, this Commission determined that it was not in the public interest to approve the Agreements. Specifically, we found that "allowing a project to avail itself of an eligibility cap (and therefore published rates) that is no longer applicable could cause ratepayers to pay more than the utility's avoided cost." Order No. 32299 at 8. For this Commission to approve a rate in excess of the utility's avoided cost would clearly be a violation of PURPA and FERC's implementing regulations. *A.W. Brown*, 121 Idaho 812, 818, 828 P.2d 841, 847 (1992).

We find that Idaho Power and Grouse Creek were in the process of actively negotiating terms of two PPAs when the eligibility for published avoided cost rates changed. The parties entered into their contracts on December 28, 2010. By the express terms of the Agreements negotiated and signed by the parties, the Agreements' "effective date" is December 28, 2010 – the "date stated in the opening paragraph of this [Agreement] representing the date upon which this [Agreement] was fully executed by both Parties." Agreements ¶ 1.11. Because the parties have existing contracts, and we find no undue or unreasonable delay on the part of Idaho Power, a determination of the existence of a legally enforceable obligation at another point in time is unnecessary. Moreover, the parties agreed that all prior agreements were superseded

---

[5] The affidavit and comments both state that the PPAs were signed on December 21, 2010, but the PPAs themselves show the date as December 20, 2010.

by the December 28, 2010 PPAs.  Here the Commission did not have to determine whether a legally enforceable obligation arose because the parties entered into written Agreements. Therefore, we affirm our prior decision that, because each PPA became effective on December 28, 2010, and each project is larger than 100 kW, published rates are not available to the projects.[6]  We also find that the Agreements expressly supersede all prior agreements, including any entitlement to an otherwise enforceable legal obligation.  The rates in the Agreements, as written, do not comply with Commission Order No. 32176.  These findings are consistent with the expressed intent and spirit of PURPA and the FERC regulations.

## O R D E R

IT IS HEREBY ORDERED that the Power Purchase Agreements between Idaho Power and Grouse Creek Wind Park and Grouse Creek Wind Park II are not approved because the rates included in the Agreements were no longer available at the time the Agreements were executed and became effective.

THIS IS A FINAL RECONSIDERATION ORDER ON REMAND.  Any party aggrieved by this Order may appeal to the Supreme Court of Idaho as provided by the Public Utilities Law and the Idaho Appellate Rules.  *See Idaho Code* § 61-627.

---

[6] The same reasoning would apply if we were to use the date (December 20, 2010) that Grouse Creek signed the Agreement.

ORDER NO. 32635                17

DONE by Order of the Idaho Public Utilities Commission at Boise, Idaho this 7th day of September 2012.

_____
PAUL KJELLANDER, PRESIDENT

_____
MACK A. REDFORD, COMMISSIONER

_____
MARSHA H. SMITH, COMMISSIONER

ATTEST:

_____
Jean D. Jewell
Commission Secretary

O:IPC-E-10-61_IPC-E-10-62_ks7